The basic legal question on this appeal is whether this Court recognizes the intentional or reckless tort of outrageous conduct causing severe emotional distress, as proposed by the American Law Institute's Restatement (Second) of Torts § 46 (1948):
 (1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.
Until now such a cause of action has been neither accepted nor rejected in Alabama. As recently as August 31, 1979, inLavoie v. Aetna Life and Casualty Co., Inc., Ala.,374 So.2d 310 (1979), involving claimed relief for an insurer's bad faith refusal to pay legitimate policy benefits, we held that the trial court's grant of a Rule 12 (b)(6) motion was inappropriate under the allegations of the complaint, stating at 312:
 [I]t is the facts of an actual case which will breathe life into the legal theories now advanced by appellants, and their claims should not be summarily dismissed at the pleading stage. . . . *Page 363 
Unlike Lavoie, the theory of Section 46 now has been given full sway in the trial court: the plaintiff has alleged facts sufficient to invoke that theory, testimony has been taken, the trial court has instructed the jury upon the law of outrageous conduct, and the jury has rendered a verdict in favor of the plaintiff in the amount of twenty-five thousand dollars. From the judgment rendered on that verdict and from the order denying its post-judgment motions, the defendant has appealed.
Admittedly, our recognition of the tort of outrageous conduct, or "severe emotional distress," would authorize recovery of damages for mental suffering alone (although Section 46 also allows recovery for accompanying bodily harm). Traditionally, damages for mental anguish alone have not been recoverable in this jurisdiction. Western Union Telegraph Co.v. Jackson, 163 Ala. 9, 50 So. 316 (1909). However, if the mental suffering has been accompanied by some physical injury, damages for mental suffering have been allowed. East Ala.Express Co. v. Dupes, 271 Ala. 504, 124 So.2d 809 (1960) (plaintiff who sustained whiplash and fracture allowed to recover for her "worry" about the future result of her injury);Macke v. Sutterer, 224 Ala. 681, 141 So. 651 (1932) (pregnant tenant who was injured from fall from steps allowed to recover from landlord damages for mental anguish (fear) because she was "caused to be in danger of a miscarriage . . ."); and seeBryson v. Phelps, 23 Ala. App. 346, 125 So. 795; cert. den.220 Ala. 389, 125 So. 798 (1930) (physical damage to his automobile allowed the owner to recover damages for his delay, vexation,annoyance and mental anguish).
Other decisions and authorities reveal a remedial situation hypocritical in nature. For example, the passenger of a carrier is allowed to recover for the use of insulting language causing mental suffering because the courts have found an implied promise in fact to provide protection from such abuse. SeaboardAir Line Ry. Co. v. Mobley, 194 Ala. 211, 69 So. 614 (1915) (reversed on other grounds in Tomme v. Pullman Co., 207 Ala. 511,93 So. 462 (1922)). Likewise it was an easy step to apply the theory of a contractual duty implied by law to make an innkeeper similarly liable. Dixon v. Hotel Tutwiler OperatingCo., 214 Ala. 396, 108 So. 26 (1926). Debt collection cases allow recovery when there is a traditional tort, such as slander or a personal trespass, Maze v. Employees' Loan Soc.,217 Ala. 44, 114 So. 574 (1927); and a trespass quare clausumfregit is also sufficient to allow damages for "nervous excitement" when no physical violence was suffered. Engle v.Simmons, 148 Ala. 92, 41 So. 1023 (1906). These decisions feign to insist upon the presence of a tort of long standing when it is perfectly obvious that any injury from the traditional tort is slight and the damages sought for the mental disturbance constitute the primary (if not the sole) reason for having initiated the action. Consider Horne v. Patton, 291 Ala. 701,287 So.2d 824 (1974) (unauthorized disclosure by physician of his patient's condition constituted prima facie invasion of right of privacy which would authorize damages for mental suffering, shame or humiliation); Holcombe v. Whitaker,294 Ala. 430, 318 So.2d 289 (1975) (fraudulent misrepresentation made willfully authorized recovery for shame, humiliation, and mental anguish, adopting Morris v. MacNab, 25 N.J. 271,135 A.2d 657 (1957), which stated: "[W]here the wrong is willful rather than negligent, recovery may be had for the ordinary, natural, and proximate consequences though they consist of shame, humiliation, and mental anguish."). The damages recoverable for mental or emotional harm thus have been described as "parasitic," that is, the right to recover for them has been dependent upon recovery for another independent, or separate, tort recognized at common law. Magruder, Mentaland Emotional Disturbance in the Law of Torts, 49 Harvard L.Rev. 1033, 1048 (1936). This distinction, however, was neither significant nor followed in Herman Saks Sons v. Ivey,26 Ala. App. 240, 157 So. 265 (1934). In that case the defendant had sent to the plaintiff a collection letter whose terms violated a criminal statute (Code of 1923 §§ 3194, 3195; Cf.
Code of 1975, *Page 364 
§ 13-6-17) imposing a sanction against sending abusive letters to another which might tend to breach the peace. The Court of Appeals, in recognizing a civil cause of action in the recipient, authorized recovery of substantial damages for the plaintiff's mental anguish, annoyance and inconvenience (plaintiff also alleged that she had been made "sick and sore for a long period of time"). And in Hamner v. Bradley, 289 Ala. 624, 270 So.2d 81 (1972), involving allegations of abusive, insulting, provocative and threatening language by an insurance agent toward a hospitalization policyholder, a convincing dissent recognized
 a marked tendency on the part of many jurisdictions to recognize that the intentional infliction of mental distress by extreme and outrageous conduct constitutes a cause of action in itself, apart from any traditional tort,
citing cases from other jurisdictions, articles on the subject, and Restatement (Second) of Torts § 46 (1948).
Universal acceptance of the theory of recovery recognized in Section 46 has been slow "[b]ecause of the fear of ficticious or trivial claims, distrust of the proof offered, and the difficulty of setting up any satisfactory boundaries to liability." Comment, Restatement, supra, at 72. Perhaps the "bad faith" accusations in insurance claims, see Vincent v.Blue Cross-Blue Shield of Ala., Inc., Ala., 373 So.2d 1054
(1979), the debt collection cases, e.g., Norris v. MoskinStores, Inc., 272 Ala. 174, 132 So.2d 321 (1961), and the employer-employee situations, such as Hinrichs v. TranquilairHospital, Ala., 352 So.2d 1130 (1977), suggest doubts to some about the wisdom of acknowledging this cause of action.
Concerning the latter, it should be sufficient to observe that an employer, by virtue of his position, possesses no roving license to treat his employee in an extreme and outrageous manner, whether before, during or after their relationship. Cf. M.B.M. Co., Inc. v. Counce, Ark.,596 S.W.2d 681 (1980). Neither does the creditor nor the claims representative with those with whom they deal. As stated by Wade, Tort Liability for Abusive and Insulting Language, 4 Vand.L.Rev. 63, 100:
 No social utility is advanced by permitting unrestrained name-calling and use of insulting language. Just as clearly, there is a mental injury to the victim of the abusive words. In the United States today intensifying emphasis is being placed upon the individual, the integrity of his personality and its legal preservation and protection. . . . The law cannot undertake to guarantee peace of mind or complete mental equanimity, but it can and should be ready to grant damages for emotional distress intentionally caused by unjustifiable name-calling.
 Administrative difficulties of trial — fears of the inadequacy of juries in assessing damages or determining fictitious claims, fears of opening the flood gates of litigation — have long been regarded as insuperable. But actual experience has shown that these fears are largely imaginary. No serious difficulties have been encountered in assessing damages in the carrier cases, the collection cases and the other exceptions to the general rule. And in the states with actionable words statutes and in other jurisdictions permitting recovery for abusive language, a survey of the cases indicates that the juries have not been reckless in awarding damages but have generally returned very moderate verdicts. . . .
He added:
 There has been no flood of litigation — at least so far as the appellate cases indicate. Indeed, judicial statistics show that defamation cases have proved almost an insignificant part of the total civil litigation in the trial courts; and there is no reason to believe that the number of actions for abusive language would be materially greater than those for defamatory language.
It should also be noted that this tort does not recognize recovery for "mere insults, *Page 365 
indignities, threats, annoyances, petty oppressions, or other trivialities." Comment, Restatement, supra, at 73. The principle applies only to unprivileged, intentional or reckless conduct of an extreme and outrageous nature, and only that which causes severe emotional distress. The rule itself provides that the trial court determine in the first instance whether recovery is indicated, cf. Rule 12 (b)(6), ARCP. And in those jurisdictions which have recognized the cause of action, appellate review frequently has upheld the denial of recovery. See Annot., 46 A.L.R.3d 772; Annot., 86 A.L.R.3d 454. For as the Massachusetts Supreme Judicial Court stated in George v.Jordan Marsh Company, 359 Mass. 244, 268 N.E.2d 915, 46 A.L.R.3d 762, 767 (1971):
 Fact finding tribunals, whether judges, juries or auditors, are considered qualified and competent to decide whether there is any emotional distress resulting from a recognized common law tort, and, if there is, to include compensation therefor in any damages awarded the victim. They would seem to be equally qualified and competent to decide the same issues when the claim is based on intentional acts allegedly causing emotional distress without a recognized common law tort. When some of these same objections were made to recovery for prenatal injuries, we said: "The advancement of medical science should take care of most of these arguments. The element of speculation is not present to any greater extent than in the usual tort claim where medical evidence is offered and the issue of causation must be weighed with great care. * * The opportunity for fraudulent claims can be faced by the courts as in other types of cases. * * *"
We therefore join with our sister states of Maryland, Massachusetts, Missouri, Tennessee, West Virginia, Georgia, Washington, Florida, California and New York in appreciating that willful wrongs, or those made so recklessly as to equate willfulness, authorize recovery in damages for the mental suffering caused thereby, and we now recognize that one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress and for bodily harm resulting from the distress. The emotional distress thereunder must be so severe that no reasonable person could be expected to endure it. Any recovery must be reasonable and justified under the circumstances, liability ensuing only when the conduct is extreme. Comment, Restatement, supra, at 78. By extreme we refer to conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society. Comment (d), Restatement,supra at 72. See also Prosser, Law of Torts (4th ed.) at 56-60 and Wade, supra, for instances which clearly fall within the principle.
The instant case, however, does not disclose facts which bring it within that cause of action. Cf. Harris v. Jones,281 Md. 560, 380 A.2d 611 (1977), in which the tort was recognized but the evidence adduced was insufficient to establish liability. Accordingly, it was error for the trial court to deny the defendant's motion for a directed verdict made at the close of the evidence and for judgment notwithstanding the verdict made thereafter.
The plaintiff, Inmon, established that he was employed as a field adjuster, and later as a claims supervisor, by The American Road Service Company, a subsidiary of Ford Motor Credit Company. The Service Company primarily provided insurance claim service to The American Road Insurance Company, another Ford subsidiary. Inmon was stationed in Atlanta for almost one year and in Birmingham for four years as a field adjuster, for the most part settling claims of automobile dealers carrying floor plan insurance. Based upon his examination he would prepare an estimate of the cost of repair which, when approved, would be paid by the insurance company, which *Page 366 
did not require that the repairs actually be made. According to Inmon, his first supervisor instructed him to prepare estimates on dealers' new car claims even when repairs were not needed. Thus he learned the corporate "numbers game" which was intended to favor the dealer by way of settlements which were based upon high estimates of small damage, or no damage at all. It was also part of Inmon's duty to dispose of "salvaged" vehicles,i.e., those not economical to repair. This was done by soliciting sealed bids or by an auction conducted by a salvage pool.
Following his Birmingham service, Inmon was transferred to Detroit in December, 1973 as a claims supervisor, and in August, 1974 he was transferred to Houston, Texas where he both trained and supervised adjusters. His immediate supervisor was Donald Brady, District Manager. Brady's immediate superior was Jim Wooley, who in turn was supervised by J.E. Neeley, Field Operations Manager. Inmon's progress reports up to this time were favorable. Nevertheless Inmon became interested in employment with another subsidiary, Ford Life, and accepted a position with that company, to begin in March or April of 1976. With the prior approval of Reggie Semic, a representative of Ford Life, Inmon traveled to Little Rock and Memphis to look for a house.
Thereafter a series of incidents occurred. Mr. Wooley wished to purchase Inmon's company car. The car had a small chip in the right corner of the windshield. According to Inmon, Wooley wished to obtain a price reduction by having Inmon alter a report on the car to represent that it had a broken windshield. Inmon did so, and Wooley purchased the car. But instead of paying for the car within four or five days, as was customary, Wooley delayed paying for about four months, necessitating several telephone "collection" calls by Inmon to Wooley.
About two weeks later Semic "backed off" the Ford Life position for Inmon and refused to approve Inmon's travel expenses. Meanwhile, Inmon went to Arkansas to adjust some tornado damage, and while there he heard that Wooley had made an unusual trip to Houston to audit salvage files. Inmon testified that he asked Brady about the subject-matter of the audit; Brady responded that a variety of things were being examined. While Inmon was engaged with the tornado claims, Brady telephoned Inmon with a peremptory order to return to Houston. About thirty minutes later, Brady telephoned to reverse that order. A few hours later this process was continued. Nevertheless, Inmon returned the next day. Brady told him that the audit did not concern him, and immediately sent him to Austin, Texas, an unusual procedure according to Inmon. When Inmon returned to Houston, Brady almost immediately sent him to Dearborn to report to Wooley. Upon reporting, Inmon was directed to a Mr. Ryan at the World Headquarters Building. Ryan, he learned, was an internal security officer with Ford. Inmon maintains that Ryan proceeded to interrogate Inmon by stating "Respond," followed by a name. At times Ryan would use files in framing his questions, but Inmon was not allowed to see the files. Subsequently Wooley joined in the interrogation, and accused Inmon of mishandling certain files without allowing him to see the files in order to provide an explanation. Several of these concerned instances of salvage sales, one of which had been approved by Wooley himself. According to Inmon, the questioning was gestapo-like and very upsetting, impliedly containing accusations of theft of some of the "overpayments." Because of his upset condition, Inmon returned to Houston only after a stopover with friends in Louisville. Upon his return to work he was told to go home and wait for a call, which never came. Although he did ultimately return to work, he was told by Brady to turn in his company car because he was being terminated. Brady read to him a prepared statement:
 An allegation has been made against you regarding kickbacks in connection *Page 367 
with the disposition of salvage. The allegation resulted from a telephone conversation that you had with another employee, which conversation was overheard by another Company employee. In an attempt to resolve the allegation, we have discussed the matter with the other two employees as well as yourself. The other employees have cooperated in the investigation, but you have not. In view of the seriousness of the allegation made against you, and your refusal to fully cooperate in the investigation, we have decided to terminate your employment with Ford Credit.
 We will give you the opportunity to resign from the Company. If you do not, you will be discharged. In either event, there will be no separation allowance.
Inmon stated that Brady acknowledged that Inmon was "getting the shaft" perhaps for his failure to take a lie detector test, which, according to Inmon, he had agreed to take if it were also given to other claims people. Brady, however, refused Inmon's request for a separation allowance or other termination benefits, although Brady did give Inmon a good recommendation for new employment.
Thus the tendencies of Inmon's evidence showed that he had been harassed, investigated without cause, humiliated, accused of improper dealings, treated uncustomarily, and terminated without justification. His evidence also established emotional distress resulting in loss of weight and insomnia. It is sufficient here to state that the company's representatives testified that their investigation related to allegations of a "kickback" scheme involving Inmon and Michael McCue, a claims supervisor in Baltimore. Inmon's honesty was also questioned through his relationship with a salvage buyer.
After considering the entire record, we have concluded that the conduct of American Road Service Company toward Inmon does not meet the requirements of the cause of action we have recognized above. There is no evidence upon which reasonable people could base the belief that the company intended to cause Inmon severe emotional distress. The Brady telephone conversations, for example, do not reveal any such intent, even though at one point, according to Inmon, Brady said that he had been told to wait until Sunday night to notify Inmon that he was to report to Detroit the next afternoon at 1:00 o'clock. Any resentment springing from such impersonal treatment is not the severe emotional distress contemplated by this tort.
Inmon points us to a number of circumstances which, he maintains, amount to outrageous conduct. For one thing, Inmon had falsified the damage estimate so that Wooley could purchase the company car (for his son-in-law) at a reduced price, and then Wooley did not pay promptly. But Inmon did not establish that any of Wooley's superiors knew of Wooley's personally dishonest transaction which "heightened" Inmon's anxiety. For another, Inmon's disagreement with Semic about his expenses in connection with the Ford Life position was not shown to have any connection with American Road, even if Semic's change of mind increased his anxiety.
The audit of Inmon's Houston files by Wooley may have substantially increased his anxiety, as he claimed, simply because the man for whom he had falsified a record performed the audit. However, the act of performing the audit was one which American Road had the legal right to order, and there is no proof that the audit was illegally or improperly performed.
The four telephone calls Inmon received from Brady while in Arkansas were described by Inmon as "highly unusual" and calculated to destroy his emotional tranquility. And then, having returned the next day, he was sent to Austin "to keep him off balance." The evidence shows, however, that he was allowed to remain in Arkansas later than his own supervisor wished, and that he was sent to Austin to reinspect the work of some auditors there. Although Inmon concluded *Page 368 
that this decision was made to keep him "off balance," these acts could not be classified as "extreme" or "outrageous."
Inmon's version of his meeting with Ryan, the investigator, on appeal is at odds with the record of that meeting. The gist of his evidence of record is that after Ryan introduced himself, he told Inmon that he had a list of names he wished responses to. Inmon said he would cooperate. The names were stated and Inmon made responses of varying lengths according to his own recollection. Although Inmon contended that Wooley and Ryan joined at this meeting in order to intimidate him in a "two on one" meeting, Wooley did not join them until Inmon himself requested the presence of someone else who "can ask me questions that you want to know." It cannot be disputed that American Road had the right to investigate Inmon's salvage disposal operations and, in that connection, to question him concerning them. Likewise, American Road also had the right to suspend Inmon from his employment following that investigation and the right to offer him the alternative of resigning or being discharged. While the record supports the conclusion that the management of Inmon's investigation and termination may have been somewhat disorganized, and a humiliating experience for him personally, nevertheless American Road's behavior throughout cannot, as a matter of law, be characterized as "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Section 46, Comment (d), Restatement at 73. As Section 46, Comment (g), Restatement at 76 states:
 The actor is never liable, for example, where he has done no more than to insist upon his legal rights in a permissible way, even though he is well aware that such insistence is certain to cause emotional distress. . . .
And Comment (d), id. at 73:
 The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. . . .
Thus we have concluded that the trial court erred in overruling the defendant's motion for a directed verdict made at the close of the evidence. For that error the judgment is due to be, and is, reversed and remanded.
REVERSED AND REMANDED.
TORBERT, C.J., and MADDOX, JONES, SHORES, EMBRY and ADAMS, JJ., concur.
FAULKNER, J., concurs in that portion of the opinion recognizing the tort of outrageous conduct and dissents in that portion which denied recovery.
ALMON, J., concurs in the result only.
[EDITORS' NOTE: PAGES 369-371 CONTAINED DECISIONS WITHOUT PUBLISHED OPINIONS.] *Page 372