These consolidated appeals respectively present questions concerning the scope of the tort of outrageous conduct arising out of a workmen's compensation insurance carrier's refusal to pay benefits, and the tort of bad faith failure of the carrier to pay benefits allegedly due under the workmen's compensation policy.
 FACTS
Carolyn Wooley filed a complaint against her former employer (who operated a bar known as "Stagger Lee's"); her former employer's insurance carrier, Continental Casualty Company (hereinafter "Continental"); and Continental claims adjusters V.A. Shewbart and Sharon Stevens.[1] In her complaint, as last amended, she claimed in Count I, that workmen's compensation benefits were due her as a result of a work-related injury;[2] in Count II, she claimed damages against Continental, Shewbart, and Stevens for the intentional tort of outrageous conduct in stopping payment of workmen's compensation benefits and in refusing to pay them; in Count III, she alleged that outrageous conduct on the part of Continental and its agents was the result of a pattern and practice of willfully, knowingly, intentionally, and recklessly denying or terminating benefits to which persons insured under the terms of workmen's compensation policies were legally entitled; and in Count IV, she claimed damages for the alleged intentional tort of bad faith on the part of Continental in the termination and refusal to pay or to reinstate workmen's compensation benefits.
The facts giving rise to Wooley's claims are as follows: Wooley, a bartender at Stagger Lee's, slipped and fell to the floor at work. She landed on her bottom, sitting up, hitting more on her left side. After getting up from the floor, Wooley attempted to work but complained of pain emanating from her bottom and from her left hip area. Wooley continued to report for work for the next four or five days, but then notified her supervisor that she needed to see a doctor. Stagger Lee's referred her to Dr. Michael Reeves for examination and treatment of her injury, and Dr. Reeves referred her to Dr. James Ramey, an orthopedic surgeon. Dr. Ramey, following his examination of Wooley, concluded that her fall at work aggravated an earlier pre-existing condition experienced by her as a child, a condition known as Legg-Calvé-Perthes disease.[3] *Page 714 
Dr. Ramey's diagnosis and recommended treatment for Wooley was later confirmed through a second medical opinion given by Dr. Kurt Niemann, director of the Division of Orthopedic Surgery at the University of Alabama at Birmingham.[4]
After Wooley notified Stagger Lee's of her injury, Stagger Lee's notified its workman's compensation insurance carrier, Continental. Sharon Stevens began to process Wooley's claim, but her claim file was later assigned to V.A. Shewbart, claims supervisor for Continental. Before Wooley's claim file was assigned to Shewbart, Wooley had received periodic workmen's compensation checks from Continental, but after her claim was assigned to Shewbart, he questioned whether the claim was a covered claim. Eventually, Shewbart recommended that benefits be terminated and that Continental not pay for a scheduled hip operation. Shewbart's decision to terminate the benefits being paid to Wooley came after his review of the file, which included the letter from Dr. Ramey, a portion of which is quoted in footnote 3, but before receipt of Dr. Ramey's letter, which enclosed a letter from Dr. Niemann in which Dr. Niemann had reached a conclusion similar to that of Dr. Ramey. See footnote 4.
Wooley was initially represented by attorney Andy Poole, who testified, by deposition, concerning discussions that he had both with Shewbart and with Stevens. Poole testified that he was in an adversarial relationship with Shewbart concerning the claim, and that Wooley had authorized him to file suit, but that he did not. Wooley subsequently requested that Poole give her the file, and she then got new counsel, who filed Wooley's complaint.
Count I, the workmen's compensation claim, was severed for a separate trial, and after a trial, the court entered an order reinstating compensation and medical benefits, based upon a finding that Wooley was injured as a result of an accident arising out of her employment.
In two separate motions filed by Continental and its two agents, these defendants sought a summary judgment on Wooley's tort of outrageous conduct count and a dismissal of Wooley's bad faith refusal count against them. The trial court denied those summary judgment motions. The court granted Continental's motion to dismiss the bad faith count and made that dismissal a final judgment under Rule 54(b), Ala.R.Civ.P.
Wooley appealed from the trial court's judgment dismissing her bad faith claim. This Court granted Continental, Stevens, and Shewbart permission to appeal from the order denying their motions for summary judgment on the tort of outrageous conduct claims and consolidated their appeal with Wooley's appeal.
 I
The defendants argue that the trial court erred in not granting their motion for summary judgment on Wooley's tort of outrageous conduct claim, asserting that their alleged conduct never rose to a level so extreme and outrageous in degree as to go beyond all bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized society. In support of their motions, the defendants filed depositions taken of Wooley, Shewbart, Stevens, and Poole. *Page 715 
The issue presented, of course, is whether the trial court erred in denying their motions. Rule 56(c) reads, in part:
 "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."
In their brief filed in support of their motion for summary judgment, the defendants argued that the alleged conduct taken by them in regard to the handling of Wooley's claim never reached the level of intolerability associated with the tort of outrageous conduct, and they cite, among other cases, the following: American Road Service Co. v. Inmon, 394 So.2d 361
(Ala. 1980), the case recognizing the tort and setting forth the elements; Garvin v. Shewbart, 564 So.2d 428 (Ala. 1990);Daniel v. Alabama Power Co. 555 So.2d 162 (Ala. 1989); Naborsv. St. Paul Ins. Co., 489 So.2d 573 (Ala. 1986); Empiregas,Inc. of Gadsden v. Geary, 431 So.2d 1258 (Ala. 1983).
Wooley counters by arguing in her brief that the conduct taken by the defendants in refusing to continue benefit payments to her, and in refusing to approve a scheduled hip operation on her, was intended by the defendants to inflict severe emotional distress upon her, and was so extreme as to go beyond all bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized society.
In Continental Casualty Ins. Co. v. McDonald, 567 So.2d 1208
(Ala. 1990), which upheld a jury award of $750,000 in a case involving a claim of outrageous conduct arising out of a workmen's compensation claim, this Court delineated the evidence, distinguished Garvin v. Shewbart, 564 So.2d 428 (Ala. 1990) (Garvin II),[5] and concluded as follows:
 "The preceding recitations of portions of the evidence and discussions of the issues regarding the statute of limitations and the jury instructions present a relatively complete picture of McDonald's position as to how CNA committed the tort of outrage. We now turn to CNA's argument that the evidence did not support the claim of outrage and that, thus, the trial court should have granted its motion for directed verdict or judgment notwithstanding the verdict.
 "The evidence recited above is sufficient to show that the jury could have found that McDonald suffered severe emotional distress because of the manner in which CNA handled his claims for medical payments. The more difficult question is whether there was evidence from which a jury could permissibly find that CNA's conduct was 'so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as utterly intolerable in a civilized society.' Inmon, 394 So.2d at 365.
 "In response to CNA's arguments that its handling of the claim did not amount to outrageous conduct, McDonald cites Inmon's reference to some of the comments to § 46 of the Restatement (Second) of Torts (1965), and points to other Restatement
comments that he argues are relevant to this action. Inmon quoted the last sentence of comment e, which states that the actor is not held liable for mere insults, indignities, or annoyances, but McDonald also quotes the first sentence: 'The extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests.' McDonald also quotes the first sentence of comment f: 'The extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity.' McDonald argues that the two comments quoted above apply to this case because, he argues, CNA abused its 'power to affect his interests' and because, he further *Page 716 
argues, CNA knew, and took advantage of the fact that, he was peculiarly susceptible to emotional distress because of his constant pain, his need for treatment for that pain, and his dependence on CNA to obtain that treatment.
 "We do not adopt the Restatement's comments to their full extent as the law in this state; indeed, the very comments quoted by McDonald have cautionary and limiting language emphasizing that the conduct must be extreme and outrageous and that the emotional distress suffered must be severe. Nevertheless, the points made about the power of CNA to affect McDonald's interest and his dependent condition are pertinent to this case.
 "This case is remarkably like Garvin II, but is also unlike it for the reasons stated above, i.e., that CNA in that case did no more than to insist on its legal rights in a permissible way. In this case, CNA put forth justifications for its delays in payments, but the jury was entitled to disbelieve CNA's evidence because of the pervasive nature of the delays, the lack of any reasonable explanation for most of them, and the evidence that CNA was attempting to 'persuade' McDonald to accept a settlement that would greatly reduce the amount that CNA would have to pay for McDonald's medical expenses. CNA had a legal right to question the reasonable necessity of the expenses, but it did so in only a very few cases, such as the Jacuzzi. Even in that instance, the jury could have concluded that CNA did not insist on its legal rights in a permissible way, because, for example, it could have found that Malinak deliberately ignored Dr. Brooks's explanations in December 1986 as to why a bathtub insert or a health spa was not an acceptable alternative but, instead, wrote to him in January 1987 asking the same question again, inferrably for the sole purpose of delaying or hindering payment of the claim. In short, CNA had no legal right to delay payments for no good reason, and the jury could have found that, on occasions when CNA did assert its legal rights, it did not do so in a permissible way.
 "This case is also distinguishable from Garvin II in other respects. McDonald's need for treatment for his pain was an immediate, day-to-day need, whereas Garvin's possible need for a third surgery was not. There was pervasive evidence here that McDonald's pain was unusually severe and rendered him especially subject to emotional distress over the continuing availability of treatment, and that CNA engaged in repeated conduct that brought the availability of treatment into doubt. Garvin's attempts to show that she was suffering distress from the delays in seeing a physician for a second surgery opinion did not so clearly cross the line of 'severe distress' and 'outrageous conduct' that the trial court could be held in error for holding that she had not satisfied the test for the tort of outrage. CNA's dilatory handling of McDonald's claims encompassed a whole spectrum of different claims over a period of five years or more, whereas its (most recent) dispute with Garvin did not ripen into unusual delays or hindrances until some time during the two-year period during which Garvin was seeking a second opinion. Most significantly, perhaps, McDonald has produced evidence from CNA's own records and communications that its goal in dealing with him was to persuade him, or, as the jury may have found, to coerce him, to settle for a lump-sum benefit, whereas Garvin produced no such direct evidence of an arguably improper motive in its dealings with her.
 "In short, the trial court held that Garvin had not presented sufficient evidence in opposition to CNA's motion for summary judgment to meet the test for the tort of outrage. As the Court stated in Inmon, 'the trial court determine[s] in the first instance whether recovery is indicated.' 394 So.2d at 365. One of Garvin's difficulties in maintaining an action was that she had recently settled a prior outrage claim against CNA for its earlier conduct in handling her claim, so only a narrow portion of its entire course *Page 717 
of conduct was pertinent to her second action. This Court affirmed the trial court's holding that the conduct at issue did not meet the stringent Inmon test.
 "This case is different. The trial court held that the evidence was sufficient to present a jury question, and we see no error in that holding. The jury was entitled to believe that CNA engaged in a deliberate effort to cause McDonald to suffer severe emotional distress in order to coerce him into accepting an unreasonably low lump-sum settlement that would drastically reduce CNA's liability for his medical expenses. The evidence supports a finding that CNA systematically withheld payments in order to cause McDonald anguish over the possibility of the cessation of medical treatments for his pain and thereby to cause him to accept a method of payment that would not subject him to CNA's 'aggravation,' as he called it. A jury could reasonably find from the evidence that such conduct was 'beyond all possible bounds of decency, . . . atrocious[,] and utterly intolerable in a civilized society.' Inmon, at 365. Therefore, the denial of CNA's motion for directed verdict and its post-trial motions was not error."
567 So.2d at 1219-1221.
The allegation in this case is simply that Shewbart denied Wooley's claim with no arguable reason for doing so. He did not communicate that denial directly to Wooley but sent a letter to her attorney. The only aspect of the denial that could conceivably be called outrageous is that it came shortly before her scheduled surgery. That fact of timing is far from being " 'so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as utterly intolerable in a civilized society.' " American RoadService Co. v. Inmon, 394 So.2d 361, 368 (Ala. 1980) (quoting Comment d, Restatement (Second) of Torts, § 46 at 73 (1948)). The evidence in this case is entirely unlike that inContinental Casualty Ins. Co. v. McDonald, from which the jury reasonably could have found that CNA had engaged over an extended time in an effort to coerce McDonald to settle his workmen's compensation benefits for an unfairly low lump-sum payment.
Therefore, the trial court erred in not granting the defendants' motion for summary judgment on Wooley's outrage claim. As to that claim, the judgment is reversed and a judgment is rendered for the defendants.
 II In her appeal, Wooley argues that the trial court erred in granting the defendants' motion to dismiss her claim alleging bad faith refusal to pay. They counter her argument by saying that, under Ala. Code 1975, § 25-5-53, part of the Alabama Workmen's Compensation Act, the so-called "exclusiveness of remedy" section, Wooley could not assert a bad faith refusal count against them. The defendants cite, among other cases, this Court's case of Waldon v. Hartford Insurance Group,435 So.2d 1271 (Ala. 1983), overruled in part by Lowman v. PiedmontExecutive Shirt Mfg. Co., 547 So.2d 90 (Ala. 1989). Wooley admits that Waldon and Garvin v. Shewbart, 442 So.2d 80 (Ala. 1983), overruled in part by Lowman v. Piedmont Executive ShirtMfg. Co., 547 So.2d 90 (Ala. 1989),[6] are authority upon which the judgment of the trial court dismissing her bad faith claim can be affirmed; nevertheless, she asks this Court to overrule those cases and permit her bad faith action in this case.
The standard of review applicable to the granting of a motion to dismiss was stated by this Court in Hill v. Kraft, Inc.,496 So.2d 768, 769 (Ala. 1986): "Motions to dismiss should be granted sparingly, and a dismissal is proper only when it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim which would entitle the plaintiff to relief. *Page 718 Garrett v. Gilley, 488 So.2d 1360 (Ala. 1986)."
In count IV of Wooley's complaint, Wooley asserted that the defendants in bad faith terminated additional workmen's compensation benefits legally due her under the Alabama Workmen's Compensation Act. In Oliver v. Liberty Mut. Ins. Co.,548 So.2d 1025, 1026 (Ala. 1989), this Court, in interpreting the exclusivity provision of Alabama's Workmen's Compensation Act and its effect on a plaintiff's claim for bad faith refusal to pay, stated the following:
 "This court has held that a claim for bad faith failure to pay an insurance claim in the context of workmen's compensation claims is barred by the workmen's compensation exclusivity provisions, but a claim based on the tort of outrage is not barred. Nabors v. St. Paul Ins. Co., 489 So.2d 573 (Ala. 1986); Garvin v. Shewbart, 442 So.2d 80 (Ala. 1983)."
(Emphasis added.)
We note that the holding in Oliver does not discuss whether the provisions of § 25-5-59 would have been applicable in that case. The decisions in Waldon, Garvin, and Oliver were based upon the exclusivity provisions of the Workmen's Compensation Act. In Crown Textile Co. v. Dial, 507 So.2d 522 (Ala.Civ.App. 1987), Judge Ingram, writing for the court, said:
 "Section 25-5-59, Code of Ala. 1975, permits such a penalty when the failure to pay is without 'good cause.' We have held that good cause exists when there is a good faith dispute as to the employer's liability to its employee. Read News Agency, Inc. v. Moman, 383 So.2d 840 (Ala.Civ.App. 1980). Judge Haley states the following on this question:
 " 'It could be argued that this question does not apply in a contested case but if the evidence shows that the defendant failed to make the payments due under the workmen's compensation law without any semblance of a "good cause" most likely the penalty could be assessed.'
 "Handbook on Alabama's Workmen's Compensation Law
at 38 (1982)."
507 So.2d at 524. In this case, of course, the trial judge awarded the plaintiff the 10% penalty based upon his determination that "said termination [of benefits] was without good cause and that plaintiff [was] entitled to the ten per cent (10%) penalty on all temporary total disability benefits not paid, as is provided in Code of Alabama 1975, Section25-5-59." Order of Judge Mark Kennedy, dated October 19, 1988.
 III
The dismissal of the claim alleging bad faith refusal to pay (89-0398) is affirmed. The denial of the defendants' summary judgment motions on the claim alleging the tort of outrage (89-0481) is reversed, and a judgment is rendered for the defendants on that claim.
89-0398 AFFIRMED.
89-0481 REVERSED AND JUDGMENT RENDERED.
ALMON, SHORES, HOUSTON and STEAGALL, JJ., concur.
JONES, J., concurs in the result.
HORNSBY, C.J., and ADAMS, J., concur in part, dissent in part.
KENNEDY, J., recused.
[1] Continental Casualty Company is one of several insurance companies that together form CNA Insurance Companies.
[2] Initially, Continental paid benefits to Wooley, but it later terminated them.
[3] Dr. Ramey thought that Wooley's condition was more serious than a bruised coccyx. He determined that she had an "old condition known as Legg's Perthes disease," a disruption of the hip joint, and he also indicated a slipped capital femoral epiphysis. In response to a letter from Continental adjuster Sharon Stevens, he stated, concerning Wooley's condition:
 "I believe that Ms. Wooley has had either an old Legg-Perthes disease with perhaps osteochondral fragments which may not have separated from the head prior to this or an old slipped capital femoral epiphysis and that in her fall, she may have dislodged one of the pieces. Again, she may not have. There is no accurate way for me to assess that. Now, the irregularity of the weight bearing surface of the head is probably causing a great deal of her pain. Therefore, I do believe that the fall aggravated a pre-existing condition and this condition, because of its nature, may persist for some time, and she may require surgical replacement of her hip in the future."
(Emphasis added.)
[4] The second opinion given by Dr. Niemann was made in response to a request for a second opinion made by Dr. Ramey to Dr. Niemann. Dr. Niemann's letter states, in part:
 "As you know this 24 year old lady was apparently diagnosed as having Legg-Perthes disease approximately 13 years ago. She now complains of left hip stiffness and pain.
 "On our examination she has a good deal of limitation of hip motion with external rotation of 30 degrees, abduction of 45 degrees and marked limited internal rotation. . . . Her X-rays reveal extensive deformity due to involvement with Legg-Perthes disease and lateral extrusion of the edge of the femoral head. We discussed a plan to include the installation of an ingrowth bipolar hip such as the Osteonics Microstructured Stem. I think in this age group this is a good option since these seem to be doing well and will likely hold up over a longer period of time than conventional cemented arthroplasty in this young age group."
[5] Garvin II involved the same company involved here, and the same claims adjuster — Shewbart.
[6] Lowman v. Piedmont Executive Shirt Mfg. Co., 547 So.2d 90
(Ala. 1989), overruled Waldon and Garvin to the extent that they may be interpreted as rejecting claims for intentional fraud, as a matter of law. Lowman did not overrule those cases in regard to the "exclusiveness of remedy" section barring a bad faith claim.