In October 1984, Michael Stewart was injured while working as an employee of Matthews Industries, Inc. Stewart sued Matthews for disability benefits under the Workers' Compensation Act. On June 21, 1988, the trial court determined that Stewart was totally and permanently disabled and ordered Matthews to pay Stewart "workmen's compensation benefits of $163.41 per week for life." Thereafter, Amerisure, Inc., the workers' compensation insurance carrier for Matthews, began paying benefits to Stewart pursuant to the court order. On August 9, 1988, Stewart's doctor in Nashville, Tennessee, who was aware of Stewart's disability rating, examined Stewart and took X-rays of his back, noting that Stewart's X-rays looked good and that fusion surgery that had been done on Stewart's back looked solid. The doctor wrote the following in his file:
 "And he is on the __________ for the rest of his life. That is what he desires. I do not feel any further treatment is required."[1]
On December 28, 1988, after Stewart again visited his doctor in Nashville, the doctor wrote the following in Stewart's file:
 "Michael continues to complain with pain about both legs. His exam is unchanged from previous exams. He continues to take Naprosyn and Robaxin. I don't feel I have anything to offer this patient and have released him. HE IS NOT TO BE SEEN IN THIS OFFICE AGAIN — OR NOT TO BE SEEN AGAIN IN THIS OFFICE."
In January 1989, after receiving this information from the doctor's office, Amerisure retained Crawford Company, a vocational rehabilitation company, to conduct a personal interview with Stewart to explore the possibility *Page 917 
of vocational rehabilitation for Stewart. In March 1989, Stewart refused a requested appointment with Crawford Company because he had scheduled a myelogram examination. However, Stewart and Crawford Company agreed to set up an interview at a later date. In May 1989, Crawford Company contacted Stewart to set up another appointment. Stewart again refused, claiming that his wife was scheduled for surgery. On July 6, 1989, Amerisure sent Stewart a letter stating that, according to a letter from the surgeon who had performed Stewart's 1989 myelogram, Stewart's myelogram was normal and vocational rehabilitation would be beneficial. The letter also stated that if Stewart refused to cooperate with Crawford Company his benefits would be terminated. Amerisure also told Stewart by telephone that his payments were in jeopardy of being terminated. Stewart did not respond to Amerisure's letter or to its telephone call. On July 25, 1989, Crawford Company wrote Stewart, stating that it was "reserving August 3 at 1:30 to meet" and requesting that Stewart "call . . . collect to confirm this appointment and give . . . directions" to his house. Stewart never called. On August 3, 1989, after Stewart had failed to show for his scheduled appointment (this was the third missed appointment), Amerisure decided to suspend his compensation benefits. On the same day, August 3, 1989, Amerisure telephoned Stewart to tell him of its decision to suspend his compensation benefits. On August 24, 1989, Crawford Company contacted Stewart by telephone to schedule an appointment; Stewart refused. On August 31, 1989, Amerisure's attorney wrote Stewart's attorney a letter reiterating to Stewart, through his attorney, that "Stewart's refusal to accept rehabilitation at [Amerisure's] request is in direct violation of Section 25-5-77, Code 1975, and [Amerisure] presently intend[s] to suspend payment of compensation until [Stewart] complies." Around September 8, 1989, Stewart received the last compensation check, a check for $198.43 for the period July 25 to August 3, 1989 (that period was more than 7 months after Amerisure had hired Crawford Company to conduct a personal interview with Stewart to determine if he was a candidate for vocational rehabilitation).[2]
On October 17, 1989, Amerisure received a letter from Stewart stating that he had never refused rehabilitation. On October 24, 1989, Amerisure wrote Stewart, stating that his benefits would be restored immediately if he would agree to meet with a vocational specialist. Stewart did not telephone to schedule a meeting, as Amerisure had requested in its letter, but rather hired an attorney. On January 5, 1989, Stewart sued Matthews and Amerisure, alleging bad faith and outrageous conduct. Linda Stewart, Michael Stewart's wife, also sued Matthews and Amerisure, claiming damages for mental anguish and loss of consortium as "a proximate consequence of [Matthews and Amerisure's] failure to pay workmen's compensation benefits to her husband." The case was tried and at the close of the Stewarts' case, Matthews and Amerisure moved for a directed verdict, which the trial court granted, holding as follows:
 "The claim of bad faith . . . [is] precluded by the Workmen's Comp. Act.
 "The tort of outrage is not precluded, but the court does not find sufficient evidence to rise to the level necessary to establish the elements and requirements of this cause of action."
Stewart appeals from the resulting judgment. We affirm.
We note that the notice of appeal names as appellants Michael Stewart and Linda Stewart and names as appellees Matthews Industries, Inc., and Amerisure, Inc. However, no argument is made concerning the propriety of the verdict for Matthews and Amerisure on Linda Stewart's claims alleging mental anguish and loss of consortium. Therefore, those claims are not before us. Furthermore, no argument is made concerning the propriety of the directed verdict for Matthews on Michael Stewart's claims alleging *Page 918 
bad faith and outrageous conduct. Therefore, those claims are not before us.
This Court has held that a tort claim against a workers' compensation carrier alleging a bad faith failure to pay an insurance claim is barred by the exclusivity provision of the Workers' Compensation Act. See Ala. Code 1975, §§ 25-5-11, -52 and -53; Farley v. CNA Insurance Co.,576 So.2d 158 (Ala. 1991); Garvin v. Shewbart, 442 So.2d 80
(Ala. 1983) (overruled on another point; see Lowman v.Piedmont Executive Shirt Mfg. Co., 547 So.2d 90
(Ala. 1989)). Therefore, the trial court properly directed a verdict for Amerisure on Stewart's bad faith claim.
While the Court has held that a claim alleging bad faith failure to pay an insurance claim, in the context of a workers' compensation claim, is barred by the exclusivity provision, the Court has recognized that the tort of outrageous conduct or intentional infliction of emotional distress can occur in a workers' compensation setting. Farley v. CNA InsuranceCo., supra; Garvin v. Shewbart, supra.
 "The [Workers' Compensation] Act is designed to compensate those who are injured on the job and provides immunity from common law suits for those employers and carriers who come within the Act. A suit seeking recovery under the tort of outrageous conduct does not seek compensation [or] medical benefits for the original on-the-job injury. The connection with the physical injury that gave rise to the original workmen's compensation claim is tenuous. The conduct giving rise to the tort of outrageous conduct in the context of this kind of case can be more accurately characterized as mental assault than as failure to pay compensation or medical benefits even though it may arise in a failure to pay context. Conduct constituting the tort of outrageous conduct cannot reasonably be considered to be within the scope of the Act. When the employer or carrier's conduct crosses the line between mere failure to pay and intent to cause severe emotional distress, the cloak of immunity is removed."
Garvin v. Shewbart, supra, at 83. (Emphasis added.)
The tort of outrageous conduct or intentional infliction of emotional distress involves "extreme and outrageous conduct" by one who "intentionally or recklessly causes severe emotional distress to another." American Road Service Co. v.Inmon, 394 So.2d 361, 365 (Ala. 1980). To make out a case of outrageous conduct, the plaintiff must show that the conduct is "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society."Id.; see Cates v. Taylor, 428 So.2d 637
(Ala. 1983).
After carefully reviewing the evidence, we conclude that none of the alleged conduct in this case crossed the minimum threshold that a defendant must cross in order to commit "outrageous conduct" actionable under our cases. See Gibbsv. Aetna Casualty Surety Co., 604 So.2d 414 (Ala. 1992), and Continental Casualty Insurance Co. v. McDonald,567 So.2d 1208, 1216 (Ala. 1990); none of that conduct reached the level of intolerability required to constitute the tort of outrage, American Road Service Co. v. Inmon, supra; none of it was "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." American Road Service Co. v. Inmon, supra, at 365. Rather, Amerisure's justifications for suspending Stewart's compensation benefits established that Amerisure was merely insisting upon its legal rights in a permissible way, for which it cannot be held liable in an action alleging the tort of outrage. See Garvin v. Shewbart, 564 So.2d 428
(Ala. 1990); American Road Service Co. v. Inmon, supra.
The trial court properly directed a verdict for Amerisure on Stewart's claim alleging outrageous conduct.
The trial court's judgment is affirmed.
AFFIRMED.
MADDOX, ALMON, SHORES, STEAGALL and INGRAM, JJ., concur.
[1] The blank space appears in the doctor's notation.
[2] Amerisure had set aside reserves for the payment of Stewart's claims over his lifetime — a disability benefits reserve in the amount of $278,124 and a medical benefits reserve in the amount of $90,980. *Page 919