Jimmy D. Buzbee appeals from a summary judgment entered in favor of Alabama Waste Services, Inc.
On December 20, 1994, Buzbee suffered an on-the-job injury while he was working in the line and scope of his employment with Alabama Waste Services, Inc. (employer).
On January 17, 1995, Buzbee filed a "First Report of Injury" with the employer, in accordance with the Alabama Workers' Compensation Act. On August 10, 1995, approximately seven months later, the employer terminated Buzbee's employment.
On August 14, 1995, Buzbee filed a complaint against the employer, seeking workers' compensation benefits. Specifically, Buzbee claimed that the employer had refused and/or declined to reimburse him for benefits due under the Workers' Compensation Act.
On April 12, 1996, Buzbee filed an amended complaint, adding Paul Burke and Bill Turner (co-employees) as defendants. In his amended complaint, Buzbee sought to recover, among other things, damages for the tort of outrage, for co-employee liability under § 25-5-11, Ala. Code 1975, and for retaliatory discharge under § 25-5-11.1, Ala. Code 1975.
On November 11, 1996, Buzbee and the employer entered into a workers' compensation settlement agreement, which the trial court approved. The settlement agreement expressly preserved Buzbee's right to pursue his pending claims for retaliatory discharge, co-employee liability, and outrage. See Gates RubberCo. v. Cantrell, 678 So.2d 754 (Ala. 1996).
On May 12, 1997, the defendants, pursuant to Rule 56(c), Ala. R. Civ. P., filed a summary judgment motion, along with supporting documentation. Buzbee responded with a motion in opposition, along with supporting documentation.
On July 28, 1997, following a hearing, the trial court entered an order, granting the defendants' summary judgment motion on all counts. Buzbee filed a post-judgment motion, which the trial court denied.
Buzbee appeals. This case is before this court pursuant to Ala. Code 1975, § 12-2-7(6).
Initially, we note that in determining whether the summary judgment for the defendants was proper, this court must apply the following well-settled standard of review:
 "The applicable standard for . . . review of a summary judgment is the substantial evidence rule. Under this rule, once the movant has shown, prima facie, that there is no genuine issue as to any material fact and that he is entitled to a judgment as a matter of law, the nonmovant must introduce substantial evidence to rebut this showing. [Rule 56(c), Ala. R. Civ. P.]; Ala. Code 1975, § 12-21-12. 'Substantial evidence' is 'evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989)."
Thomas v. BSE Industrial Contractors, Inc., 624 So.2d 1041,1043 (Ala. 1993).
 Retaliatory Discharge
Buzbee first contends that he was discharged from his employment in retaliation for having filed a workers' compensation claim. We note that in appropriate circumstances, the general rule under Alabama law is that an employee may be discharged from his employment, with or without cause or justification, for a good reason, a wrong reason, or no reason at all. Culbreth v. Woodham Plumbing Co., 599 So.2d 1120 (Ala. 1992). *Page 63 
Section 25-5-11.1, Ala. Code 1975, provides an exception to this general rule, which states that "[n]o employee shall be terminated by an employer solely because the employee has instituted or maintained any action against the employer to recover workers' compensation benefits. . . ." See McClain v.Birmingham Coca-Cola Bottling Co., 578 So.2d 1299 (Ala. 1991).
In the context of a summary judgment motion filed by the employer in regard to a retaliatory discharge claim, our supreme court, in Culbreth, 599 So.2d at 1122, stated the following:
 "[I]f the [employer] has supported a summary judgment motion with evidence of a legitimate reason for terminating the [employee], the [employee] must then refute that showing with his own prima facie case; of course, the [employee] has no burden to produce evidence before trial until the [employer] has made and properly supported a motion for [a] summary judgment. If the [employer's] showing of a legitimate reason is conclusive enough to establish that 'there is no genuine question as to [that] material fact and that the moving party is entitled to a judgment as a matter of law,' Rule 56(c), Ala. R. Civ. P., the [employee] would also have to produce evidence to refute that showing."
Furthermore, our supreme court, in Culbreth, 599 So.2d at 1122, stated that an employee had established a prima facie case of retaliatory discharge, filed pursuant to § 25-5-11.1, by showing the following:
 "[The employee] filed a worker's compensation claim for a work-related injury; the injury prevented him from working [for a period of time]; he subsequently returned to work; and upon his return he was informed that he no longer had a job."
In the instant case, it is clear that Buzbee established a prima facie case of retaliatory discharge. Buzbee sustained a work-related injury on December 20, 1994, for which he sought medical treatment under the Workers' Compensation Act; his injuries prevented him from working from approximately January 19, 1995, to April 6, 1995; he returned to work on a part-time basis in April 1995 and on a full-time basis in July 1995; and the employer terminated his position in August 1995.
In support of its motion for a summary judgment, the employer offered the testimony of Bill Turner, the employer's shop foreman. Turner's testimony established a prima facie showing that Buzbee's employment was terminated because Buzbee, on the afternoon of August 9, 1995, left work early without notifying anyone which, Turner says, is a violation of company policy. Turner further stated that Buzbee left work early on two prior occasions without notifying anyone. Turner stated that although he had given Buzbee verbal warnings, he did not place any written warnings in Buzbee's file because, Turner said, he "was trying to work with [Buzbee, who] claimed to have suffered an on-the-job injury."
We would note that the employer contends that Buzbee was not fired, but that he resigned and/or abandoned his job by "walking off" the premises without permission. However, after carefully reviewing the record, we conclude that the employer terminated Buzbee's position.
Buzbee, on the other hand, contends that the reason proffered by the employer for terminating his employment was not true, but was merely a pretext for an otherwise impermissible termination. Specifically, Buzbee contends that on August 9, 1995, he walked into Turner's office, told Turner that he had to leave early for an appointment, and Turner nodded his head. Turner does not deny that Buzbee came into his office on August 9, 1995. Instead, Turner states that he did not hear Buzbee because, he says, he was engaged in conversation with another person in the office. Furthermore, Buzbee contends that the employer never provided him with a copy of the company's personnel policies because, he says, the company was in the process of revising the policies at the time he was hired.
Buzbee introduced the following testimony from Turner regarding the employer's policy for "walking off" the job:
 "Q. So the day that Mr. Buzbee was told by you to get his tools and leave . . . *Page 64 
was the first time that you were keeping with company policy, correct?
 "A. Normally on policies like that, the first time it's a verbal warning. The second time, write-up, and the third time [the guy is] out.
 "Q. It's your testimony . . ., that [Buzbee] was only . . . given a verbal warning, correct?
"A. Correct.
"Q. Never given a written warning, correct?
". . . .
"A. That's correct."
In essence, Turner's testimony established that he did not follow company procedure when he terminated Buzbee, since he never gave Buzbee a written warning.
Buzbee also presented the testimony of one of his co-employees to show that the employer intended to terminate Buzbee's position after Buzbee returned on a full-time basis. The affidavit of the co-employee states the following, in pertinent part:
 "4. I overheard a conversation between Mr. Turner and a Mr. Caldirera. I recognized both voices. They were discussing Jimmy Buzbee. I personally heard Mr. Turner tell Mr. Caldera that he planned to let Jimmy Buzbee return to work for a while and then fire him. To the best of my memory and knowledge, this conversation took place while Jimmy Buzbee was on worker's compensation leave of absence."
Buzbee further presented the following testimony, which establishes that his co-employees were instructed by their supervisors not to communicate with him:
 "Q. Anyone else — well, have there been any statements made that would indicate that anyone was mad at you because you filed a worker's [compensation] claim?
 "A. The boy Sam that I was talking about that was the truck driver was stopped talking to me one day as I was coming back in, and Bobby Caldirera, . . . his boss, jumped all over him, chewed him out for stopping and talking to me and told him that I was off limits, not to talk to me.
". . . .
"Q. And how did you find out about that?
"A. Sam came and told me.
". . . .
 "Q. And Mike Roberts is the other one that you were telling me about?
"A. That's correct.
". . . .
"Q. And who said something to Mike Roberts?
"A. Jim Sheppard.
"Q. And what did Mr. Sheppard say?
 "A. Jim Sheppard told him not to cross that line to come over there and talk to me, that I was off limits.
". . . .
"Q. And how did you find out about that?
"A. Mike came and told me.
". . . .
 "Q. Other than these two, did anyone else say anything that [led] you to believe that they were mad at you because you filed a worker's [compensation] claim?
 "A. The two welders that were working there when I came back to work full time, just they were the ones that brought it to my attention that Paul Burke was watching me all the time, and he was because I caught him."
Burke is the owner of the company. Buzbee testified that he normally saw Burke in the shop area approximately three times a week, but that after he was injured, he saw Burke anywhere from six to seven times a day. Buzbee stated that after his accident, Burke began watching him frequently and that on one occasion, Burke told him that he could "quit faking that limp."
After viewing the evidence in a light most favorable to Buzbee, we conclude that Buzbee presented substantial evidence to refute the employer's proffered legitimate reason for terminating his position. Culbreth. Thus, the trial court erred in entering a summary judgment in favor of the employer on Buzbee's claim for retaliatory discharge. *Page 65 
 Co-employee liability
Buzbee next contends that his injuries were caused by the willful, deliberate, and intentional conduct of both Turner and Burke. Specifically, Buzbee contends that he suffered injuries when a ladder on which he was standing collapsed. Buzbee testified that the ladder had collapsed on two prior occasions, that he had informed Turner that the ladder was defective, and that Turner insisted that Buzbee continue to use the ladder.
In Padgett v. Neptune Water Meter Co., 585 So.2d 900, 901
(Ala. 1991), our supreme court stated, "Section 25-5-11(a) provides that actions may be maintained against those parties that may be jointly liable with the employer, provided that if the other party is a co-employee, then his actions, in order togive rise to liability, must be willful." (Emphasis added.)
In Bean v. Craig, 557 So.2d 1249, 1252 (Ala. 1990), our supreme court stated the following:
 "The legislature, in recognizing the difference between negligent and willful actions, sought to ensure that cases of this type would not be submitted to a jury without some evidence showing either: (1) the reason why the co-employee would want to intentionally injure the plaintiff, or someone else, or (2) that a reasonable person in the position of the defendant would have known that a particular result was substantially certain to follow from his actions. An employee may be liable for injuries sustained by a fellow employee only when such injury is caused by the offending employee's willful conduct. . . .
". . . .
 "A plaintiff suing a co-employee must show facts tending to prove that the co-employee set out purposefully, intentionally, or by design to injure someone; a showing of mere negligence is not enough. Evidence showing only a knowledge or an appreciation of a risk of injury will not entitle a plaintiff to a jury determination of whether the co-employee acted with a purpose, intent, or design to injure another. A co-employee must either have actual knowledge that an injury will occur from his actions or have substantial certainty that injury will occur."
(Citations omitted) (emphasis added).
Buzbee testified that when the ladder collapsed the first time, he notified his immediate supervisor, who stated that he would talk to Turner about getting some new ladders. Buzbee stated that when the ladder collapsed the second time, he notified both his immediate supervisor and Turner and that Turner stated that he had ordered some new ladders. However, according to Buzbee, Turner insisted that Buzbee continue to use the ladder to complete a particular job. The following testimony was elicited from Buzbee:
 "A. I told [Turner] . . ., this ladder has done collapsed again and I'm not going to use it anymore.
"Q. What was his response?
 "A. 'I've got some ordered, I've got some ordered.'
 "Q. Was that the extent of your conversation with [Turner]?
 "A. Well, backing up to [the previous accident], now I spoke with him about using the ladder before I went out there and used it on this particular job.
". . . .
"Q. What did you tell him?
 "A. . . . I said, '[Turner], the only ladder we've got to use is the one that already collapsed twice.' [Turner said] 'I know, I know, [Buzbee], but we've got to get [the job] done. If you don't mind, we need to get it done.'
"Q. Is that the reason you used that ladder?
"A. Yes, sir."
Buzbee further testified that he did not know any reason why either Turner or Burke would want to willfully or intentionally see him get hurt. Buzbee also testified that he did not know of anyone else who had been injured on the ladder and that he was unaware of any modifications or repairs to the ladder.
Turner testified that he had inspected the ladder on all three occasions and found nothing *Page 66 
defective about the ladder. Turner's affidavit states the following, in pertinent part:
 "4. Prior to Buzbee's alleged injury in December 1994, it had been reported to me that Buzbee had fallen off one of [the] ladders. After the second occasion, I inspected the ladder and found nothing on the ladder that was in need of repair. It was reported to me that the first fall by Buzbee occurred when the wind blew open a door that hit the ladder and knocked Buzbee off the ladder.
 "5. Because I found no problem with the ladder, I did not remove the ladder or tell Paul Burke, [the owner], about the ladder."
Thus, notwithstanding the fact that Turner was aware that the ladder had collapsed on two prior occasions, and allegedly instructed Buzbee to continue to use it to complete a particular job, this evidence tends to prove only negligent, and not willful, conduct. As noted previously, Buzbee could not state any reason why either Turner or Burke would want to see him get hurt. Thus, we conclude that the trial court did not err in entering a summary judgment in favor of the employer on Buzbee's claim filed pursuant to § 25-5-11(a), based on the alleged willful conduct of his co-employees.
We note that Buzbee contends that the doctrine of spoliation applies in this case and that it creates a genuine issue of material fact. We disagree. Our review of the record reveals that Buzbee was injured in December 1994. In April 1996 the employer could not locate the ladder for its inspection. Buzbee contends that the employer purposely and wrongfully "lost" the ladder. However, Buzbee produced no evidence to indicate that the employer purposely or intentionally destroyed the ladder.
As noted previously, Turner testified that he inspected the ladder each time that Buzbee stated it had collapsed and that he detected no problems with the ladder. Turner testified as follows regarding the ladder:
"Q. Well, what happened to the ladder?
"A. I don't know.
 "Q. Did somebody make the decision to get rid of the ladder?
 "A. No, sir. It wasn't — the ladder was put up, and where the ladder went to, no one knows. But the ladder was stored in an area.
 "Q. Was it taken out of service after Mr. Buzbee got hurt December 20, 1994?
 "A. Yes — it was taken out of service, not for the reason that there was anything wrong with it.
"Q. Why was it taken out of service?
 "A. Someone had supposedly got injured on a ladder, and I wanted to keep it.
". . . .
 "A. And in the year and a half that's gone by or what, two years, I can't tell you. I don't know."
As noted by the trial court, "the doctrine of spoliation requires an active attempt to suppress or [to] destroy evidence. No such evidence exists in this case." See Christianv. Kenneth Chandler Construction Co., 658 So.2d 408 (Ala. 1995).
Consequently, the trial court did not err in determining that the doctrine of spoliation was inapplicable in this case.
 Tort of Outrage
Buzbee finally contends that the employer's conduct was extreme or outrageous because, he says, "Paul Burke harassed him at work by constantly watching him, presumably to validate the suspicion that Buzbee was faking his injury . . . and by telling him [that] he could 'quit faking the limp.' "
In Thomas v. BSE Industrial Contractors, Inc.,624 So.2d 1041, 1043 (Ala. 1993), our supreme court stated the following well-settled law regarding the tort of outrage:
 "This Court first recognized the tort of outrage . . . in American Road Service Co. v. Inmon, 394 So.2d 361 (Ala.[1980]). In Inmon, the Court held that to present a jury question the [employee] must present sufficient evidence that the [employer's] conduct (1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it. The Court defined the second element of the tort of outrage as follows: *Page 67 
'By extreme we refer to conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.' Inmon, 394 So.2d at 365 (quoting Restatement (Second) of Torts, § 46 cmt. d, at 72 (1948)).
". . . .
 "This Court has consistently held that the tort of outrage is a very limited cause of action that is available only in the most egregious circumstances. As a consequence, this Court has held in a large majority of the outrage cases reviewed that no jury question was presented."
Furthermore, we note that the tort of outrage "does not recognize recovery for 'mere insults, indignities, threats, annoyances, petty oppression, or other trivialities.' "American Road Service Co. v. Inmon, 394 So.2d at 364-65 (quoting Restatement (Second) of Torts § 46, Comment d, at 73 (1965)).
Thus, considering the limited nature of this tort, we conclude that the employer's alleged conduct in this case cannot be characterized as "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." Inmon, 394 So.2d at 365. As such, we conclude that the trial court did not err in entering a summary judgment in favor of the employer on Buzbee's claim of outrage.
Based on the foregoing, we reverse that portion of the trial court's judgment entering a summary judgment on the retaliatory discharge claim; we affirm that portion of the judgment entering a summary judgment on the co-employee liability and the outrage claims.
The foregoing opinion was prepared by Retired Appellate Judge Richard L. Holmes while serving on active duty status as a judge of this court under the provisions of § 12-18-10(e), Code 1975.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
All the judges concur.