On Application for Rehearing
The opinion released December 11, 1992, is withdrawn, and the following opinion is substituted therefor.
The plaintiff, K.S., appeals (case 1910836) from the trial court's denial of her "Batson" motion. The defendants, John Carr and Lifeline Children Services, Inc., cross-appeal (case 1910856), arguing that the trial court erred in denying their motion for a directed verdict.
This case presents the following issues: 1) whether the trial court erred in finding that Lifeline and Carr's use of their peremptory strikes was not racially motivated and therefore did not violate Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712,90 L.Ed.2d 69 (1986), Edmonson v. Leesville Concrete Co., ___ U.S. ___, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991), and Thomas v.Diversified Contractors, Inc., 551 So.2d 343 (Ala. 1989); 2) whether, assuming the trial court erred with regard to theBatson issue, this Court should address the challenge to the sufficiency of K.S.'s evidence; and 3) assuming we should address this issue, whether the trial court erred in denying Lifeline and Carr's motion for a directed verdict.
In 1987, K.S., a white, unmarried minor female, discovered that she was pregnant. She eventually entered into an agreement with Lifeline whereby she agreed to place her child with Lifeline for adoption. Lifeline, in turn, agreed that if K.S. placed her child for adoption then Lifeline would pay all of K.S.'s medical expenses related to her pregnancy and the birth of her child.
After the child's birth, Lifeline placed him in a foster home. K.S. later changed her mind and decided that she wanted to keep the child. Three days after notifying Lifeline of her decision, K.S. regained custody of the child. K.S. claims that during the three-day interval Lifeline wrongfully withheld the from her in an attempt to force her to assume responsibility for the medical bills.
K.S. sued Lifeline and Carr, Lifeline's director, for damages, alleging the torts of *Page 709 
outrage and invasion of privacy. Lifeline and Carr initially filed a motion to dismiss, which was denied by the trial court. The trial court then granted their motion for summary judgment on the invasion of privacy count, but denied their motion with regard to the tort of outrage.
Following discovery, the case proceeded to jury selection. The record shows that seven members of the venire were black. Lifeline used five of its six peremptory challenges to remove blacks from the venire. After the clerk called the names of the 12 veniremembers who had not been struck, K.S. moved for a mistrial, arguing that Lifeline and Carr had struck blacks from the venire in a racially discriminatory manner.
Without expressly finding that K.S. had established a prima facie case under Ex Parte Branch, 526 So.2d 609, 625
(Ala. 1987), the trial court directed Lifeline and Carr to state their reasons for striking the black veniremembers. After hearing the explanations and the arguments of counsel, the trial judge held that Lifeline and Carr had not violatedBatson. Accordingly, he denied K.S.'s motion for a mistrial.
The case proceeded to trial. At the conclusion of K.S.'s case, Lifeline and Carr moved for a directed verdict, and the court overruled the motion. Lifeline and Carr renewed their motion for a directed verdict at the close of all the evidence. The trial court again denied the motion and submitted the case to the jury, which returned a verdict in favor of Lifeline and Carr. No party filed post-trial motions, and the trial court entered a judgment based on the jury verdict.
K.S. appealed, and Lifeline and Carr cross-appealed.
 I. The "Batson" Issue
We first note that K.S., a white female, does have standing to challenge the use of peremptory challenges to eliminate blacks from the venire in this civil action. In Thomas v.Diversified Contractors, Inc., 551 So.2d 343 (Ala. 1989), we held that the Batson principle applies in civil as well as criminal cases. See also, Edmonson v. Leesville Concrete Co., ___ U.S. ___, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991). Moreover, the United States Supreme Court has held that white litigants, as well as black litigants, have standing to challenge the discriminatory use of peremptory challenges to remove blacks from the jury venire. Powers v. Ohio, 499 U.S. ___,111 S.Ct. 1364, 113 L.Ed.2d 411 (1991).
Lifeline and Carr argue that K.S.'s Batson motion was not timely. We disagree.
In support of their argument, Lifeline and Carr citeMcGruder v. State, 560 So.2d 1137 (Ala.Crim.App. 1989). In that case, the defendant made a Batson motion after the members of the venire that had been struck had been dismissed from the courtroom. 560 So.2d at 1142. In explaining its approval of the trial court's holding that the defendant's Batson motion was untimely, the Court of Criminal Appeals stated, "It is the release of the unselected members of the venire and the problems and difficulties created thereby which truly govern the timeliness of a Batson motion." Id. at 1143.
After thoroughly reviewing the record, we find no support for Lifeline and Carr's contention that K.S.'s motion was made after the venire had been dismissed. Accordingly, we conclude that the Batson motion was timely.
Lifeline and Carr also assert that K.S. failed to present a clear record containing sufficient evidence of the race of the veniremembers. We disagree and conclude that the record, taken as a whole, sufficiently establishes the race of the veniremembers who were struck as well as the race of those who were not.
The record shows that seven members of the venire were black and that the remaining members were not. In denying K.S.'s motion, the trial judge stated, "[T]here were seven blacks on this [venire]. Five were struck by the defendants." We recognize that the record does not name the two black veniremembers who were not struck. However, Lifeline and Carr discuss in their brief the striking of five black *Page 710 
veniremembers. Moreover, they discuss, by name, the two blacks who were not struck.
We now turn to the issue of whether Lifeline and Carr provided sufficiently race-neutral explanations for using five of their six peremptory challenges to remove blacks from the venire.
We note that, initially, the party alleging discriminatory use of peremptory challenges bears the burden of establishing a prima facie case of discrimination. Ex parte Branch,526 So.2d 609, 622 (Ala. 1987). After a prima facie case has been established, there is a presumption that the peremptory challenges were used to discriminate against black jurors. Exparte Branch, 526 So.2d at 623. The responding party then must articulate a clear, specific, and legitimate reason for the challenge that relates to the particular case to be tried and that is nondiscriminatory. Ex parte Bird, 594 So.2d 676, 679
(Ala. 1991), quoting Batson, 476 U.S. at 97, 106 S.Ct. at 1723. Once the responding party has articulated a race-neutral reason or explanation for eliminating the black jurors, the moving party can offer evidence showing that the reason or explanation is merely a sham or pretext. Ex parte Branch, 526 So.2d at 624. When the trial court has followed this procedure, its determination will be overturned only if that determination is clearly erroneous. Ex parte Branch, 526 So.2d at 625.
In reviewing a decision of the Court of Criminal Appeals, we stated:
 "[T]he reviewing court's inquiry, whether the [challenged party's] explanations are offered voluntarily or by order of the trial judge, shall not be restricted by the mutable and often overlapping boundaries inherent within a Batson-analysis framework, but, rather, shall focus solely upon the 'propriety of the ultimate finding of discrimination vel non.' "
Huntley v. State, [Ms. 1910530, September 18, 1992] ___ So.2d ___ (Ala. 1992) (quoting Merrill v. Southern MethodistUniversity, 806 F.2d 600, 605 (5th Cir. 1986). Accordingly, we will review the relevant portions of the record in determining whether the trial court's ultimate determination that the reasons given for the strikes were race-neutral was clearly erroneous.
Counsel for Lifeline and Carr stated that they struck black veniremember B.K. because he was single, had no children, and was "not on the work force." The record shows, however, that white veniremembers M.G. and C.F. were also single. Moreover, it appears from the record that white veniremembers M.G., C.F., L.H., and C.M. were also childless. Additionally, white veniremember L.C. stated during voir dire that she was unemployed.
We further note that B.K. was asked only one specific question on voir dire. That is, Lifeline and Carr asked B.K. if he would find for them if the evidence showed that they were not liable. B.K. responded in the affirmative.
Among the factors we consider in determining whether a proffered explanation is a sham or pretext is whether "persons with the same or similar characteristics as the challenged juror were not struck." Branch, 526 So.2d at 624. Even if the fact that B.K. was single, had no children, and was not in the work force could be viewed as a valid basis for excluding him from the jury, the fact that whites who shared some of the same characteristics were not excluded leads us to conclude that the proffered explanation was a sham or pretext.
Lifeline and Carr's counsel stated that they struck black veniremember B.F. because she had no children and was a nurse at Cooper Green Hospital. The record shows, however, that B.F. stated that she had three children. Moreover, while B.F. was in the health care profession, she was not a nurse. Rather, she was a darkroom technician. Therefore, even if the fact that a juror had no children or was a nurse would relate to her service as a juror, neither of these characteristics actually applied to B.F.
Lifeline and Carr's counsel stated that they struck black veniremembers W.C. and J.M. (# 189) because they had previously been plaintiffs in civil lawsuits. W.C. *Page 711 
had been a plaintiff in an employment discrimination suit and J.M. had been the plaintiff in a lawsuit involving a traffic accident. Both cases were settled before trial. The record further shows that the husband of white veniremember L.H. had previously been a plaintiff in a civil lawsuit; L.H. was not removed from the jury. Moreover, the record shows that the lawsuit in which L.H.'s husband had been involved proceeded to trial and was submitted to a jury.
Another consideration that would lead us to reject a proffered explanation is that the explanation is "based on a group bias where the group trait is not shown to apply to the juror specifically." Branch, 526 So.2d at 624 (quoting Slappyv. State, 503 So.2d 350, 355 (Fla.Dist.Ct.App. 1987);affirmed, State v. Slappy, 522 So.2d 18 (Fla. 1988), cert.denied, Florida v. Slappy, 487 U.S. 1219, 108 S.Ct. 2873,101 L.Ed.2d 909 (1988)). Moreover, Lifeline and Carr's counsel did not ask any of these veniremembers about any biases they may have had. See Branch, 526 So.2d at 623.
We conclude that with regard to these four veniremembers, the trial court's determination that they were struck for race-neutral reasons is erroneous. The explanation given for striking one of the black veniremembers is factually inaccurate, based on that veniremember's testimony during voir dire. Some of the white veniremembers who were not struck shared some of the same characteristics based upon which one of the black veniremembers was struck. Two black veniremembers were struck for reasons that were not fully articulated and that were not based on specific questions directed to those veniremembers on voir dire. Each of these factors indicates the insufficiency of an explanation offered as "race-neutral."[1]
Accordingly, the judgment of the trial court based on the jury verdict is reversed.
 II. The Determination of Whether to Address the Merits of the Cross-Appeal
Having reversed the judgment of the trial court based on the jury verdict, we now must determine whether it is proper for this Court to address Lifeline and Carr's challenge to the sufficiency of K.S.'s evidence.
Ordinarily, a Batson violation cannot be considered harmless error. However, we need not treat a Batson violation as harmless error in order to reach the issue raised in the cross-appeal. In this case, there are two errors, both of which are reversible.
If we had ruled against K.S. on her appeal, then the cross-appeal would properly be dismissed as moot and the judgment of the trial court would be affirmed. However, having decided that Lifeline and Carr violated Batson in the use of their peremptory challenges, we must reverse the judgment of the trial court and then proceed to address Lifeline and Carr's contention that the trial court erred in denying their motion for a directed verdict. If we were to conclude that Lifeline and Carr were not entitled to a directed verdict at the close of all the evidence, then, and only then, should we remand this case for a new trial. If, on the other hand, we conclude, after reviewing the record, that the trial court erred in denying the defendants' motion for directed verdict, then we must render a judgment for Lifeline and Carr.
If Lifeline and Carr were entitled to a judgment as a matter of law, then there was no role for the jury to play as factfinder and the coincidence that the defendants' use of their peremptory challenges in jury selection violatedBatson should not yield a different result. A directed verdict precludes the submission of the case to the jury.[2] Rule 50(a), A.R.Civ. *Page 712 
P., provides that "[t]he order of the court granting a motion for a directed verdict is effective without any assent of the jury." Moreover, there is no indication in the record that the constitution of this jury had a prejudicial effect on K.S.'s presentation of her case. Accordingly, we conclude that the composition of the jury is irrelevant to the trial court's decision whether to direct a verdict. To decide otherwise would make compliance with Batson the tail that wags the dog; that is, Batson would become superior to aspects of procedural and substantive law in the State of Alabama that are not related to juries and their composition.
K.S. contends that in order for this Court to examine the sufficiency of the evidence, Lifeline and Carr not only must have moved for a directed verdict at the close of all the evidence, under Rule 50, A.R.Civ.P., but also must have timely moved for a judgment notwithstanding the verdict. We disagree. In each of the cases cited by K.S. on this issue, the appellant received an adverse jury verdict. Schwertfeger v. Moorehouse,569 So.2d 322 (Ala. 1990); Barnes v. Dale, 530 So.2d 770
(Ala. 1988); Bains v. Jameson, 507 So.2d 504 (Ala. 1987); Perduev. Gates, 403 So.2d 165 (Ala. 1981); and Great Atlantic Pacific Tea Co. v. Sealy, 374 So.2d 877 (Ala. 1979). It is clear from those cases that in order for a jury verdict loser to appeal, challenging the sufficiency of the evidence, he first must have moved for a directed verdict at the close of all the evidence and then he must renew that motion by moving for a judgment notwithstanding the verdict or for new trial.[3] None of those cases, however, addresses an appeal by a jury verdictwinner who on appeal is faced with the possible reversal of the favorable jury verdict.
In A.T.F. Trucking Co. v. Fisher Brothers Sales, Inc.,498 So.2d 846 (Ala.Civ.App. 1986), the plaintiff received a favorable jury verdict but was dissatisfied with the amount of damages. He then moved for a judgment notwithstanding the verdict or for a new trial. The trial court granted the j.n.o.v. with regard to liability and ordered a new trial on the issue of damages. In reversing the judgment of the trial court, the Court of Civil Appeals stated: "This court is at a loss to understand why a j.n.o.v. was granted when the verdict was already in favor of plaintiff and moving party. Such action would appear to be contrary to Rule 50(b), A.R.Civ.P." 498 So.2d at 848. It appears, then, that Lifeline and Carr would not have been permitted to move for a j.n.o.v. after receiving a favorable jury verdict; clearly, any judgment they sought would have been consistent with the jury's verdict.
Rule 50(b), A.R.Civ.P., provides that a motion for j.n.o.v. must be filed within 30 days from the entry of judgment. The record shows that the judgment was entered in this case on January 15, 1992, and that K.S. filed her notice of appeal on February 26, 1992. In order for Lifeline and Carr to move for a j.n.o.v. within the 30-day time limit (which ended February 14, 1992), they would have had to file their motion before K.S. filed her notice of appeal. It would clearly be an exercise in futility for a jury verdict winner to move for a j.n.o.v. before that party is even aware that the losing party is challenging the jury verdict. Accordingly, we conclude that Lifeline and Carr properly preserved for appeal the issue of whether the trial court erred in denying their motion for directed verdict. *Page 713 
 III. The Merits of the Cross-Appeal
The standard of review applicable to a directed verdict or to a denial of a motion for a directed verdict is whether the nonmoving party has presented substantial evidence in support of his position. If he has not, then a directed verdict is proper. Bailey v. Avera, 560 So.2d 1038, 1039 (Ala. 1990). A verdict is properly directed only where there is a complete absence of proof on a material issue or where there are no disputed questions of fact for the jury to determine. Woodruffv. Johnson, 560 So.2d 1040 (Ala. 1990). Moreover, whether to direct a verdict is not a matter within the discretion of the trial court; on review no presumption of correctness attaches to such a ruling. McCord v. McCord, 575 So.2d 1056, 1057
(Ala. 1991); Barksdale v. St. Clair County Comm'n,540 So.2d 1389 (Ala. 1989).
Our function is to review the entire evidence and all reasonable inferences that a jury might have drawn therefrom, in the light most favorable to the nonmoving party,Thomaston v. Thomaston, 468 So.2d 116, 119 (Ala. 1985), and if reasonable inferences in favor of the nonmovant's claim can be drawn from the evidence, we must hold that the motion should have been denied. Zaharavich v. Clingerman, 529 So.2d 978, 980
(Ala. 1988). To satisfy the "substantial evidence test" (see §12-21-12, Ala. Code 1975), the nonmoving party is required to present "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v.Founders Life Assurance Co. of Florida, 547 So.2d 870, 871
(Ala. 1989); Rowden v. Tomlinson, 538 So.2d 15, 19 (Ala. 1988).
In Nabors v. St. Paul Ins. Co., 489 So.2d 573, 574
(Ala. 1986), we stated that a claim of outrageous conduct "is an action difficult of proof and one for which recovery may be had only upon meeting all the elements of the stringent standard announced in American Road Service Co. v. Inmon, 394 So.2d 361
(Ala. 1980)." In Inmon, we held that "one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress." 394 So.2d at 365. In order for the plaintiff to recover for emotional distress, it must be "so severe that no reasonable person could be expected to endure it." 394 So.2d at 365. Any award of damages for this tort "must be reasonable and justified under the circumstances"; and liability will ensue "only when the conduct is extreme." 394 So.2d at 365. Extreme conduct is that which is "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." 394 So.2d at 365. Recovery of damages for the tort of outrage is limited "to the most reprehensible situations." Kizziah v. Golden Rule Ins.Co., 536 So.2d 943, 948 (Ala. 1988).
Considered in the light most favorable to K.S., the evidence shows the following: In early 1987 she was an unmarried minor and was approximately six months pregnant. K.S. agreed with Lifeline Services to place her child for adoption. Lifeline agreed that if K.S.'s child was finally placed with adoptive parents, then Lifeline would pay the medical expenses related to K.S.'s pregnancy and the birth of the child. Lifeline agreed and advised K.S. that at any point before the judicial termination of her parental rights, she could elect to keep her child. The record further shows that K.S. and her parents agreed that if she chose to keep the child they would be responsible for the medical expenses. As the basis of her outrage claim, K.S. alleges that John Carr and Lifeline refused to return the child to K.S. until she formally assumed responsibility for the medical bills.
K.S.'s testimony shows that the child was born on July 14, 1987. The next day, Kim Acton, a Lifeline counselor, placed the child with a foster family for temporary care pending adoption. Acton also executed a note payable to St. Vincent's Hospital in payment of K.S.'s medical expenses. During the course of K.S.'s pregnancy and after the birth, Acton repeatedly advised *Page 714 
K.S. that she could elect to keep the child rather than releasing it for adoption. K.S.'s parents, however, would not agree for her to rear the child in their home.
In early August 1987, an aunt of K.S. agreed that K.S. could live with her and rear the child. On Monday, August 10, 1987, K.S. telephoned Kim Acton and notified her that she had chosen to keep the child. K.S. agreed to meet with Acton the following day to discuss her decision. On Tuesday, August 11, K.S. met with Acton, and Acton expressed her opinion that it would be very difficult for K.S. to rear the child. Acton reminded her, however, that she was free to make that decision. At that time, Carr reminded K.S. that she had agreed to assume the medical expenses if she kept the child and advised her that she should make the necessary arrangements before picking up the child.
K.S. went to St. Vincent's Hospital that afternoon and attempted to make arrangements for the payment of the bill. Because K.S. was only 18 years old, she was not permitted to assume personal responsibility for the bill. Neither K.S.'s parents nor her aunt was willing to assume the debt. K.S. notified Acton and Carr of her problems with St. Vincent's Hospital. Carr again explained that the medical bills were her responsibility and that she should make some arrangement for their payment before she picked up the child. However, according to K.S.'s testimony, neither Carr nor Acton told her that she would not be permitted to take her child until she made proper arrangements with St. Vincent's.
On Wednesday, August 12, K.S. contacted Acton at Lifeline to make plans to pick up the child. Acton told K.S. that the child was sick and that it would be better to wait until the next day. There was no evidence that this representation was false. During this conversation, Carr again reminded K.S. of her obligation regarding the medical bills and requested that she make arrangements with the hospital before she picked up the child. There is no evidence that Carr told her at this time that she would not be allowed to pick up the child before she made arrangements with the hospital.
K.S. arranged with Acton to pick up the child on the morning of Thursday, August 13. K.S. was unable to follow through with this plan because she did not have transportation. Acton again advised K.S. by telephone that she should take care of the bill at St. Vincent's. At approximately 3:30 p.m. on Thursday, August 13, K.S. telephoned John Carr from an attorney's office. K.S. and the attorney had attached a recording device to the attorney's telephone. Both K.S.'s testimony and the tape recording of the conversation reflect the following: K.S. told Carr that she had been unsuccessful in making any arrangements with St. Vincent's Hospital. Carr emphasized that K.S. was obligated to assume responsibility for the medical bills and that Lifeline should not be left with that responsibility. Both Carr and Acton told K.S. that they would not prevent her from picking up the child.
Later that day, K.S. went to Lifeline and picked up her child. At that time, no one other than Lifeline had assumed the debt to St. Vincent's Hospital.
While we may agree that K.S.'s experience was emotionally stressful, we must conclude that she did not present substantial evidence to support her claim that the conduct of Lifeline or John Carr was "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." Inmon, 394 So.2d at 365. In Inmon, this Court recognized that the tort of outrage does not allow recovery for "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." 394 So.2d at 365. After thoroughly reviewing the record, we conclude that the conduct of John Carr and any other agent of Lifeline may be characterized, at worst, as disorganized. There is no evidence, direct or indirect, from which a jury could infer that the conduct in question was extreme and outrageous or that it was done with the intent to inflict severe emotional distress upon K.S. To the contrary, the evidence is undisputed that the defendants cooperated with K.S. from the time she *Page 715 
first contacted them until she ultimately took custody of her child. Accordingly, we conclude that the trial court erred in denying Lifeline and Carr's motion for a directed verdict.
 CONCLUSION
The judgment of the trial court based on the jury verdict is reversed because of the Batson violation. Based on the merits of the cross-appeal, as discussed above, we are compelled to render a judgment for the defendants.
ORIGINAL OPINION WITHDRAWN; OPINION SUBSTITUTED; APPLICATION GRANTED; 1910836 — REVERSED; 1910856 — JUDGMENT RENDERED.
HORNSBY, C.J., and MADDOX, SHORES, HOUSTON and STEAGALL, JJ., concur.
KENNEDY, J., concurs in part and dissents in part.
[1] We decline to address the proffered explanation for striking black veniremember J.M. (# 185). Because the striking of one black veniremember for a racially discriminatory reason violates the rule established in Batson, even if we were to accept the proffered explanation for striking veniremember # 185, the outcome of this case would not be altered.
[2] In Perry v. State, 368 So.2d 310, 312 (Ala. 1979), this Court held that the harmless error rule has no field of operation where the trial court refuses to give a requested jury charge as to the legal effect of the right of an accused not to testify. In that case, the constitutional violation was presumed to have a prejudicial effect on the role of the jury as factfinder.
[3] As noted above, Lifeline and Carr moved for a directed verdict at the close of K.S.'s case and renewed that motion at the close of all the evidence. Thus, Lifeline and Carr did all that they could do, prior to the submission of the case to the jury, to preserve for appeal their challenge to the sufficiency of K.S.'s evidence. If the jury had returned a verdict in favor of K.S., then Lifeline and Carr would have had to move for a j.n.o.v. or for a new trial in order to preserve their right to appeal.
By way of comparison, we note that the Batson issue was forever preserved for appeal when K.S. moved for a mistrial at the conclusion of jury selection.