804 So.2d 180 (2001)
ARTHUR RUTENBERG HOMES, INC.
v.
William B. NORRIS and Jennifer L. Norris.
1990994.
Supreme Court of Alabama.
March 30, 2001.
Rehearing Denied June 1, 2001.
*181 Sterling G. Culpepper, Jr., and Donald R. Jones, Jr., of Balch & Bingham, L.L.P., Montgomery, for appellant.
*182 Mark D. Ryan, Bay Minette, for appellees.
HOUSTON, Justice.
Dr. William B. Norris and his wife Jennifer L. Norris sued First American Builders, Inc.; Arthur Rutenberg Homes, Inc.; Arthur Rutenberg Service Corporation; Gary Wright; David Marcanio; and Ed Blocker. All of the individual defendants were associated with all of the business defendants.[1] The plaintiffs sought damages based on allegations of breach of contract, negligence, and fraud, all relating to the construction of a house for the plaintiffs. A pretrial settlement released First American Builders (hereinafter "First American"), Wright, Marcanio, and Blocker from liability. After a trial, the jury returned a verdict for the plaintiffs and against Arthur Rutenberg Homes, Inc. (hereinafter "ARH"), on the fraud claim, awarding compensatory damages of $300,000. The jury found no liability for Arthur Rutenberg Service Corporation (hereinafter "Service Corporation"). ARH filed a postverdict motion for a judgment as a matter of law ("JML"), which the trial court denied. The court entered a judgment on the verdict. ARH appeals. We reverse and remand.

I.
On June 3, 1994, ARH, a Florida corporation, entered into a franchise and license agreement with Wright for the purpose of building ARH-designed houses in Baldwin County, Alabama. Under this agreement, ARH gave Wright the "non-exclusive right, franchise and sub-license to use the trademark and trade name `[ARH]' ... and the non-exclusive right, franchise and privilege to use [ARH]'s operations manual, plans and specifications, systems, techniques, and knowledge in the construction and sale of residences." Before the plaintiffs decided to build their house, Wright and First American, as a prerequisite for obtaining an ARH franchise, had already constructed an ARH model house, which ARH inspected and approved, and one ARH-designed residential house. Both homes were constructed in Baldwin County and were undisputedly well built. The plaintiffs inspected both houses before they signed the building agreement with First American.
On April 27, 1995, the plaintiffs signed a building agreement with First American, in which First American agreed to build an ARH-designed house for the plaintiffs.[2] On page six of this agreement, the plaintiffs placed their initials beside the following paragraphs:
"I understand that `[ARH]' is a trademark only, and is being used by the Builder, [First American], and by [ ] Service Corp[oration] and that neither Arthur Rutenberg, personally, nor [ARH], has any legal involvement in or responsibility, obligation or liability for the construction of my home, or for performance of this Agreement or any warranties or guaranties contained herein."

(Emphasis added.)
"I understand that [ARH] and Arthur Rutenberg, personally, HEREBY DISCLAIM *183 ANY AND ALL WARRANTIES OR GUARANTIES WHETHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OR GUARANTIES OF FITNESS AND MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE."

(Emphasis in original.)
The total cost of the house, at the time the plaintiffs signed the agreement, was to be $454,321. However, the cost increased to $648,701 after the plaintiffs, with the assistance of an ARH house designer, made alterations and additions to the basic ARH house plans.
With the permission of building superintendent Marcanio, the plaintiffs and their family moved into an incomplete house. After a while, with the house still incomplete, the plaintiffs stopped making payments to First American. An attorney for First American informed the plaintiffs in a letter that First American would file a breach-of-contract claim against the plaintiffs if they did not resume making payments on the house. They did not make payments; instead they filed this action.[3]
Before the trial began, the plaintiffs and First American, Wright, Marcanio, and Blocker entered into a $1 million settlement agreement that released those defendants from liability for the construction of the house. Thus, ARH and Service Corporation were the only defendants remaining at trial.
The plaintiffs alleged at trial that their house did not meet the building standards ARH promised in its promotional materials. According to ARH's "1995 Spring Portfolio," each ARH-designed home was constructed using "problem-free construction practices"; those construction practices included methods to ensure a solid foundation for each house. (Plaintiffs' Exhibit 3 at 59, 66-67.) That same portfolio indicates that franchise builders such as First American, who build ARH-designed homes, use these "problem-free construction practices." Id. The building agreement the plaintiffs signed provides that their house was to be built with "craftsmanship equal [to] or better than that used in the model home." (Defendants' Exhibit 2.)
The plaintiffs presented evidence at trial indicating that their house did not meet those building standards. For example, cracking and settlement occurred throughout the home, raw sewage leaked to the surface around the septic system, and the basement flooded during rainy weather. H. Cliff Pitman, an expert in residential construction, testified that the problems with the house, particularly the settling of the soil below the front portion of the house, could not be corrected without demolishing the entire structure, clearing the site, and rebuilding the same house with the correct specifications. He estimated that this process would cost $1,271,983. Pitman further testified that the construction practices ARH's materials indicated would be used would be above-average practices, if they were adhered to.
ARH moved for a JML at the close of the plaintiffs' case. ARH argued that the plaintiffs could not hold ARH responsible for the construction of the house because the plaintiffs had signed a building agreement that ARH claimed absolved it of liability. The trial court denied the motion. When the defense concluded its case, ARH moved the trial court for a judgment in its favor, relying once again *184 on the building agreement. The trial court denied the motion. Although the jury returned a verdict in favor of Service Corporation, the jury awarded the plaintiffs $300,000 in compensatory damages against ARH on the fraud claim. The trial court entered a judgment on that verdict.
After the jury had returned its verdict, ARH filed another JML motion, claiming again that the agreement protected ARH from liability. The trial court also denied this motion. ARH appeals, challenging the denial of its postverdict JML motion.

II.
This Court's standard for reviewing a trial court's denial of a JML motion is well established:
"We review a trial court's denial of a motion for a [JML] by the same standard we applied to an order denying the motion formerly known as a motion for a directed verdict. Winn Dixie of Montgomery, Inc. v. Colburn, 709 So.2d 1222, 1223 n. 1 (Ala.1998). `The standard of review applicable to a directed verdict or to a denial of a motion for a directed verdict is whether the nonmoving party has presented substantial evidence in support of his position.' K.S. v. Carr, 618 So.2d 707, 713 (Ala.1993). `Substantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989)."
Fleetwood Enters., Inc. v. Hutcheson, 791 So.2d 920, 923 (Ala.2000).
"Upon review of a motion for a directed verdict or a [judgment notwithstanding the verdict], evidence must be viewed in the light most favorable to the nonmoving party, and if reasonable inferences in favor of the plaintiffs claim can be drawn from the evidence, the motion must be denied. Zaharavich v. Clingerman, 529 So.2d 978, 980 (Ala.1988)."
Woodruff v. Johnson, 560 So.2d 1040, 1041 (Ala.1990).

III.
ARH contends that the plaintiffs' fraud claim must be taken as a claim of promissory fraud. We agree. ARH further contends that the plaintiffs failed to present substantial evidence of promissory fraud. To be entitled to a JML, it was sufficient for ARH to show that, as to any element of promissory fraud, the plaintiffs failed to present substantial evidence supporting their claim. See Hosea O. Weaver & Sons, Inc. v. Towner, 663 So.2d 892, 894 (Ala.1995). In order to prove a claim for promissory fraud, the plaintiff must prove:
"(1) [T]hat the defendant made a false representation of a material fact; (2) that the false representation was relied upon by the plaintiff; (3) that the plaintiff was damaged as a proximate result of the reliance; (4) that the representation was made with a present intent to deceive; and (5) that when the representation was made the defendant intended not to perform in accordance with it."
Howard v. Wolff Broadcasting Corp., 611 So.2d 307, 311 (Ala.1992) (emphasis omitted), cert. denied, 507 U.S. 1031, 113 S.Ct. 1849, 123 L.Ed.2d 473 (1993), cert. denied sub nom. I.M.T.C., Inc. v. N.L.R.B., 507 U.S. 1032, 113 S.Ct. 1851, 123 L.Ed.2d 474 (1993).
ARH argues that the plaintiffs failed to present substantial evidence indicating that they relied on any representations made by ARH. Because this case was filed before this Court decided Foremost Insurance Co. v. Parham, 693 So.2d 409 (Ala.1997), readopting the "reasonable-reliance" standard for judging a fraud claim, *185 the plaintiffs had to prove only that their reliance was "justified," not that it was "reasonable." See Bailey v. Rowan, 751 So.2d 504, 507 (Ala.1999). In Hickox v. Stover, 551 So.2d 259 (Ala.1989), overruled by Parham, supra, this Court set forth the following standard for determining "justifiable reliance":
"`A plaintiff, given the particular facts of his knowledge, understanding, and present ability to fully comprehend the nature of the subject transaction and its ramifications, has not justifiably relied on the defendant's representation if that representation is "one so patently and obviously false that he must have closed his eyes to avoid the discovery of the truth."'"
551 So.2d at 263 (quoting Southern States Ford, Inc. v. Proctor, 541 So.2d 1081, 1091-92 (Ala.1989) (Hornsby, C.J., concurring specially)).
The undisputed evidence in this case is that the plaintiffs are well-educated and intelligent persons who are capable of reading and understanding the building agreement. Dr. Norris, who had the benefit of 13 years of education after high school, is an otolaryngologist (an ear, nose, and throat doctor) and was 45 years old when he signed the building agreement. Mrs. Norris is a college graduate and is a former schoolteacher.
Furthermore, Dr. Norris has real-estate experience; he had previously purchased and sold several pieces of property. He also has knowledge of the construction business, having worked two summers during college as a carpenter's helper and in recent years having supervised the renovation of at least two of his former residences.[4]
Despite this knowledge and education, Dr. Norris testified at trial that he only skimmed the agreement and then signaled to Mrs. Norris that the document was satisfactory for her to sign. Mrs. Norris testified that she did not read the agreement but merely signed where her husband indicated.
The plain and unambiguous language of the building agreement the plaintiffs signed states that ARH cannot be held liable for the construction of a home built by First American. The law is clear on how the courts handle contracts with unambiguous language:
"Where a contract is unambiguous and plain in expression, we know of no canon of construction that warrants an interpretation the only effect of which is to relieve a party to the contract from consequences deemed by him hard or unfair. Where the parties express without ambiguity their intention, no court can alter the agreement, and no room for judicial construction is left."
Lilley v. Gonzales, 417 So.2d 161, 163 (Ala. 1982) (citing Springdale Gayfer's Store Co. *186 v. D.H. Holmes Co., 281 Ala. 267, 201 So.2d 855 (1967)).
Because the language of the building agreement clearly absolves ARH of any liability involving the building of the plaintiffs' house, the plaintiffs could not have justifiably relied on any representations they say ARH made with respect to the construction of their house.[5]

IV.
The trial court erred by denying ARH's motion for a JML on the plaintiffs' fraud claim. Accordingly, we reverse the trial court's judgment and remand the case for that court to enter a judgment in favor of ARH on this claim.
REVERSED AND REMANDED.
SEE, LYONS, BROWN, HARWOOD, and WOODALL, JJ., concur.
MOORE, C.J., and JOHNSTONE, J., dissent.
STUART, J., recuses herself.
JOHNSTONE, Justice (dissenting).
I respectfully dissent. ARH has perpetrated a monumental fraud against these plaintiffs. The written disclaimer is part of the scheme.
ARH solicited the plaintiffs directly with its own advertising and personnel. ARH expressly represented that ARH itself was literally the builder. ARH affirmatively concealed the involvement of any other entity as the builder. ARH expressly represented that it was superlatively excellent and totally and directly responsible to its customers. ARH's written disclaimer of all responsibility in the local builder's contract is inadequate in prominence to nullify ARH's entire promotional campaign to the absolute contrary. The disclaimer is, however, proof-positive of a preexisting intent not to fulfill the duties of total responsibility promised in its promotional campaign. We should affirm.
NOTES
[1] Wright was the owner of First American Builders at the time that company built the Norrises' house. Marcanio is the First American Builders construction superintendent who supervised the building of the house. Blocker currently owns First American Builders, which is now known as Legendary Home Builders, Inc.
[2] On April 28, 1995, Dr. Norris signed a building agreement with First American to build another ARH house that he planned to use for investment purposes. Although the original complaint also stated a claim relating to the incomplete status of the investment house, this appeal concerns only claims regarding the plaintiffs' residence.
[3] Although the business records of First American indicated that the plaintiffs owed $208,515 on the house at the time this case was filed, First American offered to reduce the balance to $67,373 and to complete construction upon payment thereof.
[4] Dr. Norris himself actually managed the renovations on the first house, and as to that house he inspected the work of the subcontractors, without hiring a general contractor.

Dr. Norris hired a general contractor for the renovations on the second house. However, Dr. Norris and the contractor had a dispute over costs and delays in renovations. Dr. Norris testified at trial that it was the problems with the contractor that caused him to recognize the importance of a written contract:
"Q: [Defense counsel] So it's fair to say that after your experience with [the general contractor], you felt that before you would build another house, you wanted the complete understanding put down in writing so that everybody would be on all fours about what this contract was about.
"A: [Dr. Norris] That's what I was hoping for."
(C.R.713.)
[5] We note that ARH also argues that the trial court erred by denying its motion for a JML because, ARH says, the plaintiffs failed to present substantial evidence indicating that ARH intended to deceive the plaintiffs. Our holding regarding the element of reliance, however, makes any discussion of this issue unnecessary.