[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1145 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1146 
Tom Hurst and Linda Hurst and Mike Cook and Carrie Cook had a long-standing friendship that began more than 11 years ago when the Hursts and the Cooks lived in Florida. The Hursts moved to Alabama in 1995, and, later, the Cooks also made Alabama their home. In August 2003, the Cooks offered to allow the Hursts to live in the Cooks' former house in Hanceville rent free. The Cooks further offered the Hursts the use of the furnishings remaining in the house. According to the Hursts, however, the Cooks told the Hursts that any personal property remaining in the house was the Hursts to do with as they saw fit. The Cooks admit that they considered the possibility of deeding a life estate in the property to the Hursts; however, the Hursts contend that the Cooks promised to deed a life estate in the property to the Hursts. No deed was ever prepared. The Hursts moved into the Cooks' former house in September 2003.
At some point before December 2004, the Cooks decided to sell their former house and the property surrounding it. In December 2004, the Cooks notified the Hursts that they would need to vacate the premises by February 15, 2005. On or about December 6, 2004, the Hursts filed in the Cullman County Probate Court a written agreement signed by them and Mike Cook. That written agreement read as follows:
 "WITNESSETH: That in consideration of the mutual covenants and agreements to be kept and performed upon the part of said parties hereto, respectively as herein stated, [Mike Cook] does hereby covenant and agree that . . .:
 "I. As of [March 10, 2004], the House and Lower-Apt. and Garage Buildings at 1220 Co. Rd. 548 Hanceville, AL 35077, has my permission to take possession of and to occupy by [sic] *Page 1147 
my good friends Thomas and Linda Hurst until their deaths. This agreement is a precursor of a Life Estate Agreement promised by [Mike Cook] to [the Hursts], of which [sic] will be issued on or before 6/1/04.
 "II. And [the Hursts] covenant and agree that [they] shall: Pay $1.00 a month in consideration of said agreement. Therefore, $100.00 in cash is given at this time by [the Hursts] to [Mike Cook] in consideration of this agreement. Also, [the Hursts] will have responsibility of utilities of house and their Apt.-Garage Bldg. only. Also, [the Hursts] will have access to use work-shop that is located on the 3rd Acre of said Property.
 "III. Other terms to be observed between the parties: When and if the Upper Apt., of said Apt.-Garage Bldg. which will be occupied by Father Robert Cox is ever vacated by him; the entire said Apt.-Garage Bldg. will there-with be solely occupied by the Hurst family. And separately, all home furnishings, appliances, i.e. contents of which were left in Apt.-Garage Bldg. and house by [Mike Cook] are hereby given unconditionally to [the Hursts]."
The Cooks contend that the agreement the Hursts filed is a forgery. Mike Cook made a police report alleging that the Hursts had forged his signature on the written agreement. Although the police began an investigation of the alleged forgery, the police made no arrests as a result of the investigation.
According to the Hursts, while they were moving out of the house on February 16 and 17, 2005, the Cooks orally harassed them and physically threatened them. In addition, the Hursts allege that Carrie Cook, or someone acting on her behalf, broke into the house by breaking a window. The Hursts accused Carrie Cook of taking some of the Hursts' property, including their telephone-answering machine. The Hursts said that they telephoned the police about the break-in and that the police made Carrie Cook return the stolen items.
Based on the filing of the written agreement in the probate court and the difficulties that ensued in having the Hursts move from the house, the Cooks filed, on January 28, 2005, an action alleging that the Hursts had slandered title to the property, had conspired to defraud the Cooks by forging Mike Cook's signature on the written agreement, and had converted the Cooks' personal property. The Cooks further sought to quiet title to the property, to set aside any purported conveyance to the Hursts, and to eject the Hursts from the property. The Hursts answered the complaint and asserted malicious-prosecution, abuse-of-process, fraud, negligence, wantonness, intentional-infliction-of-emotional-distress (referred to hereinafter as "the tort-of-outrage"), defamation, and breach-of-contract counterclaims.
The Cooks moved for a summary judgment on their requests to quiet title and to set aside any purported conveyance to the Hursts and on the Hursts' counterclaims. The trial court entered a summary judgment in favor of the Cooks on the quiet-title claim, determined that the request that any purported conveyance be set aside was moot, and entered a summary judgment in the Cooks' favor on the abuse-of-process, malicious-prosecution, tort-of-outrage, negligence, wantonness, and fraud counterclaims asserted by the Hursts. In addition, although it did not recite in the conclusion of the summary-judgment order that the breach-of-contract counterclaim, which related to both the real property and the personal property mentioned in the written agreement, was being adjudicated, the trial court clearly stated in the *Page 1148 
summary-judgment order that the Hursts' breach-of-contract counterclaim regarding both the real property and the personal property "must fail" and stated, in regard to the breach-of-contract counterclaim relating to the personal property, that "the Hursts have, at most, an affirmative defense to the Cooks' conversion claim." Finally, the summary-judgment order states that the Hursts are precluded from recovering punitive damages on that portion of their defamation counterclaim based on allegedly libelous statements made by the Cooks. The trial court certified the summary judgment as a final judgment pursuant to Rule 54(b), Ala. R. Civ. P. The Hursts appealed the summary judgment to the Alabama Supreme Court, which transferred the appeal to this court, pursuant to Ala. Code 1975, § 12-2-7(6).
The Hursts initially challenge the propriety of the trial court's certification of the summary judgment as a final judgment pursuant to Rule 54(b). If the certification of the summary judgment is inappropriate with respect to a particular claim, this court does not have jurisdiction to consider that particular claim on appeal. Ex parte Simmons,791 So.2d 371, 381 (Ala. 2000) (holding that an interlocutory order disposing of only part of a claim was not subject to being certified pursuant to Rule 54(b) and therefore vacating that portion of this court's judgment purporting to affirm that interlocutory order and, further, considering other issues raised in the appeal and cross-appeal).
 The rule itself reads, in pertinent part: "When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. . . ."
Rule 54(b). Both this court and our supreme court have considered several times the propriety of a Rule 54(b) certification, and several principles governing the appropriateness of such certifications have been developed.
 "In Moss v. Williams, 747 So.2d 905, 907
(Ala.Civ.App. 1999), this court stated:
 "`Not every order has the requisite element of finality that can trigger the operation of Rule 54(b), Ala. R. Civ. P. James v. Alabama Coalition for Equity, Inc., 713 So.2d 937 (Ala. 1997). "Rule 54(b) certifications should be made only in exceptional cases and should not be entered routinely." Parrish v. Blazer Financial Services, Inc., 682 So.2d 1383 (Ala.Civ.App. 1996).'
 "Further, `"[a]ppellate review in a piecemeal fashion is not favored, and trial courts should certify a judgment as final, pursuant to Rule 54(b), only in a case where the failure to do so might have a harsh effect."' Point Clear Landing Ass'n, Inc. v. Point Clear Landing, Inc., 864 So.2d 369, 371
(Ala.Civ.App. 2003) (quoting Harper Sales Co. v. Brown, Stagner, Richardson, Inc., 742 So.2d 190, 192 (Ala.Civ.App. 1999))."
First Southern Bank v. O'Brien, 931 So.2d 50, 52-53
(Ala.Civ.App. 2005).
Our supreme court has further explained that in cases in which an adjudicated claim and a unadjudicated counterclaim are "so closely intertwined that separate adjudication would pose an unreasonable risk of inconsistent results," Rule 54(b) certification is inappropriate. Branch v. SouthTrust Bankof Dothan, N.A., 514 So.2d 1373, 1374 (Ala. 1987). InBranch the trial court certified a summary judgment *Page 1149 
on a claim alleging that an obligor had defaulted on a promissory note as a final judgment pursuant to Rule 54(b); the obligor's fraud counterclaim relating to the conduct of the loan officer in securing his signature on the note remained pending in the trial court. Branch, 514 So.2d at 1373. The supreme court noted:
 "Rule 54(b) is properly applied in a situation where the claim and the counterclaim present more than one claim for relief, either of which could have been separately enforced. Cates v. Bush, 293 Ala. 535, 307 So.2d 6 (1975). Under `appropriate facts,' a partial summary judgment on an original claim may be finally adjudicated pursuant to Rule 54(b), leaving a counterclaim undecided so that the parties can further litigate the issues presented by the counter-claim."
Id. at 1374. Because the claim for recovery under the promissory note and the counterclaim of fraud in the inducement of the execution of the promissory note were "closely intertwined," the supreme court determined that the situation in Branch was not a situation that Rule 54(b) had been designed to cover, and, thus, it set aside the Rule 54(b) certification of the summary judgment. Id.
Our supreme court relied on Branch recently to set aside another Rule 54(b) certification. Summerlin v.Summerlin, 962 So.2d 170, 173-74 (Ala. 2007). InSummerlin a wife petitioned for injunctive relief to have her husband's remains disinterred from the cemetery in which he had been buried, Serenity Memorial Gardens Cemetery; she claimed that her father-in-law had "unduly pressured" her into agreeing to bury her husband at Serenity Memorial Gardens instead of at Mobile Memorial Gardens, where their son was buried. Summerlin, 962 So.2d at 171. The father-in-law filed a breach-of-contract counterclaim against the wife, alleging that she had entered into a oral contract in which she had agreed to have the husband's remains interred at Serenity Memorial Gardens in exchange for the father-in-law's payment of the burial expenses, that she had later agreed to leave the husband's remains undisturbed in exchange for the father-in-law's allowing her to retain certain personal property for which the husband owed the father-in-law, and that she had breached those agreements by filing her petition for injunctive relief. Id. at 171-72. The wife had already moved for a summary judgment at the time the father-in-law filed his counter-claim; the trial court subsequently entered a summary judgment in the wife's favor, ordering that the husband's remains be disinterred from Serenity Memorial Gardens and that they be reinterred at Mobile Memorial Gardens.Id. at 172. The trial court certified that summary judgment as a final judgment pursuant to Rule 54(b).Id.
Our supreme court considered the issue of the appropriateness of the Rule 54(b) certification ex mero motu. Id.
at 172-73. After a discussion of the principles regarding Rule 54(b) certification, the court pointed out that the wife's claim seeking injunctive relief appeared to be a separate and distinct claim from the father-in-law's counterclaim alleging breach of contract. Id. at 173. The court then stated: "If one looks beyond form, however, [the father-in-law's] breach-of-contract counterclaim is, in substance, a defense to [the wife's] petition for injunctive relief." Id. at 173. Thus, the court concluded, "[i]n short, the issues presented in [the father-in-law's] counterclaim and those in [the wife's] petition for injunctive relief `are so closely intertwined with other claims that separate adjudication would pose an unreasonable *Page 1150 
risk of inconsistent results.'" Id. at 174 (quoting Branch, 514 So.2d at 1374).
The Summerlin court cited Automatic LiquidPackaging, Inc. v. Dominik, 852 F.2d 1036, 1038 (7th Cir. 1988), as support for its conclusion that certain counter-claims can be so intertwined as to be inappropriate for Rule 54(b) certification. Id. In Dominik the federal court considered whether a Rule 54(b) certification on a summary judgment entered on a claim requesting enforcement of a contract was appropriate in light of the pendency of a counterclaim requesting that the contract be voided because it had expired. Dominik, 852 F.2d at 1038. TheDominik court concluded that the certification was inappropriate because "[the two claims] are the same claim, expressing the parties' opposed interpretations of the [contract], though configured as a plaintiff's claim in the complaint and as a defense masquerading as a positive claim for relief in the counterclaim." Id. Thus, when a counter-claim is in the nature of a defense to a claim raised by the plaintiff, Rule 54(b) certification of a summary judgment on one of those claims is likely inappropriate.
Likewise, certification of a decision addressing only the type of damages recoverable on a certain claim is inappropriate.Haynes v. Alfa Fin. Corp., 730 So.2d 178, 181
(Ala. 1999). Although Rule 54(b) permits the "entry of a final judgment as to one or more but fewer than all of the claims or parties," it does not permit the trial court to make final an order that does not dispose of an entire claim.Haynes, 730 So.2d at 181. As the court said, "`there is no such thing as a "claim for punitive damages." Rather, there are claims on which our law authorizes the trier of fact to impose punitive damages if certain wrongfulness is proved by a sufficient weight of the evidence.'" Id. (quotingHines v. Riverside Chevrolet-Olds, Inc.,655 So.2d 909, 925 (Ala. 1994), over-ruled on other grounds, StateFarm Fire Cos. Co. v. Owen, 729 So.2d 834 (Ala. 1998)). Thus, a determination that punitive damages are not recoverable on a certain claim does not dispose of a substantive claim and does not give the trial court authority to certify the judgment as final pursuant to Rule 54(b).Haynes, 730 So.2d at 181.
The summary judgment in the present case disposes of a number of claims. It quiets title in the subject property in the Cooks and rejects the malicious-prosecution and abuse-of-process counterclaims asserted by the Hursts against the Cooks that arose out of Mike Cook's swearing out a warrant against the Hursts alleging forgery. The trial court further rejected the Hursts' tort-of-outrage counterclaim based on the various actions taken by the Cooks. The summary judgment also disposed of the negligence, wantonness, and fraud counterclaims asserted by the Hursts. In addition, the trial court determined that the Hursts could not seek punitive damages for that part of their defamation counterclaim that was based on allegedly libelous statements made by the Cooks. Finally, the trial court rejected the Hursts breach-of-contract counterclaim regarding both the real property and the personal property.[1] The *Page 1151 
claims remaining in the trial court for later adjudication are the Cooks' slander-of-title, ejectment, conspiracy-to-defraud, and conversion claims and the Hursts' defamation counterclaim.
The trial court's summary-judgment order indicates in its very text that the Hursts' breach-of-contract counter-claim, insofar as it relates to the personal property that was the subject of both the oral and the written agreements, is more appropriately a defense to the Cooks' conversion claim, which seeks damages for the Hursts' conversion of that very property. Thus, we cannot see how the trial court's certification of the summary judgment on the Hursts' breach-of-contract counter-claim insofar as it relates to the personal property does not run afoul of the standard set out in Branch, and more recently in Summerlin, that a judgment disposing of counterclaims that are in the nature of defenses to an unresolved original claim should not be certified pursuant to Rule 54(b). Summerlin, 962 So.2d at 174;Branch, 514 So.2d at 1374. Because the trial court's judgment as to the breach-of-contract counterclaim relating to the personal property was not properly certified, and because the negligence, wantonness, and fraud counterclaims arising from the alleged breach of either the oral or written agreement to gift the personal property to the Hursts are inextricably intertwined with the breach-of-contract counterclaim relating to the personal property and the conversion claim, the certification of the judgment as to those counterclaims was error as well. In addition, the trial court's judgment regarding the availability of punitive damages on that portion of the Hursts' defamation counterclaim based on allegedly libelous statements made by the Cooks is clearly not subject to being certified as final pursuant to Rule 54(b).Haynes, 730 So.2d at 181.
Because the summary judgment as to those counterclaims was not properly certified, we set aside the certification of finality pursuant to Rule 54(b) insofar as it pertains to the defamation-damages determination and both the breach-of-contract counterclaim and the related tort counter-claims insofar as they relate to the oral or written agreements to gift the personal property, and we remand those counter-claims to the trial court. However, because the other counterclaims resolved by the trial court's summary-judgment order do not appear to be so closely intertwined with the remaining claims that a risk of inconsistent judgments is created by the certification, we will address the summary judgment on the Cooks' claim seeking to quiet title and on the malicious-prosecution, abuse-of-process, and tort-of-outrage counterclaims asserted by the Hursts. In addition, we will address the Hursts' negligence, wantonness, fraud, and breach-of-contract counterclaims insofar as they relate to the agreement to convey a life estate in the real property.
We review a summary judgment de novo; we apply the same standard as was applied in the trial court. A motion for a summary judgment is to be granted when no genuine issue of material fact exists and the moving party is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P. A party moving for a summary judgment must make a prima facie showing *Page 1152 
"that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Rule 56(c)(3); see Lee v. City of Gadsden, 592 So.2d 1036,1038 (Ala. 1992). If the movant meets this burden, "the burden then shifts to the nonmovant to rebut the movant's prima facie showing by `substantial evidence.'" Lee,592 So.2d at 1038 (footnote omitted). "[S]ubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v.Founders Life Assurance Co. of Florida, 547 So.2d 870, 871
(Ala. 1989); see Ala. Code 1975, § 12-21-12(d). Furthermore, when reviewing a summary judgment, the appellate court must view all the evidence in a light most favorable to the nonmovant, and must entertain all reasonable inferences from the evidence that a jury would be entitled to draw.See Nationwide Prop. Cos. Co. v. DPF Architects,P.C., 792 So.2d 369, 372 (Ala. 2000); and Fuqua v.Ingersoll-Rand Co., 591 So.2d 486, 487 (Ala. 1991).
We first note that the Hursts do not make any specific argument that the trial court erred in entering a summary judgment in favor of the Cooks on their claim seeking to quiet title, thus indicating that they have elected to not pursue a reversal of the summary judgment on that claim. See Tucker v.Cullman-Jefferson Counties Gas Dist., 864 So.2d 317, 319
(Ala. 2003). In fact, the Hursts concede that the written agreement does not meet the requirements of Ala. Code 1975, § 35-4-20, which generally requires conveyances to be in writing, signed by the contracting party, and attested by one witness, to pass title to the property.[2] Because the written agreement does not meet the requirements of § 35-4-20, it did not operate to pass title to the real property to the Hursts. Mississippi Valley Title Ins. Co. v.Hardy, 541 So.2d 1057, 1061 (Ala. 1989); see also Smithv. Smith, 892 So.2d 384, 388 (Ala.Civ.App. 2003). The summary judgment on the Cooks' quiet-title claim is therefore affirmed.
In addition, the Hursts make no cognizable argument regarding the summary judgment entered in the Cooks' favor on the malicious-prosecution and abuse-of-process counterclaims. The Hursts' brief argues for a reversal of the summary judgment entered on all of their counterclaims in the aggregate while focusing primarily on the reasons the trial court erred in entering a summary judgment on the breach-of-contract and related tort counterclaims on the basis that the written agreement was unenforceable. Because the malicious-prosecution and abuse-of-process counterclaims are based on Mike Cooks' making a police report reporting the Hursts' alleged forgery of his signature and because the forgery allegation was not at issue in the summary-judgment proceedings, the validity of the written agreement has no bearing on the malicious-prosecution *Page 1153 
and abuse-of-process counterclaims.
Although the Hursts, in contravention of Rule 28(a)(10), Ala. R.App. P., fail to make any legal argument supported by authority specifically concerning the malicious-prosecution and abuse-of-process counterclaims, we will briefly address the legal merits of the summary judgment on those counterclaims.See Kirksey v. Roberts, 613 So.2d 352, 353 (Ala. 1993) (explaining that an appellate court may consider an argument that is not compliant with Rule 28(a)(10) if the court is able to adequately discern the issues presented); Bishop v.Robinson, 516 So.2d 723, 724 (Ala.Civ.App. 1987) (explaining that an appellate court may consider an argument that is not compliant with Rule 28(a)(10) when the appellee adequately responds to the issues raised by the appellant in brief despite the noncompliance); and Thoman Eng'rs, Inc.v. McDonald, 57 Ala.App. 287, 289, 328 So.2d 293, 295
(Civ. 1976) (explaining that an appellate court may consider an argument that is not compliant with the predecessor to Rule 28(a)(10) when the argument "has been raised in a manner which is fair to all concerned"). To recover for the tort of malicious prosecution, a plaintiff is required to prove that the defendant, without probable cause and with malice, initiated legal proceedings against the plaintiff and that the legal proceedings terminated in the plaintiff's favor, yet caused the plaintiff damage. See Fina Oil Chem. Co.v. Hood, 621 So.2d 253, 256 (Ala. 1993). "The tort of abuse of process differs from the tort of malicious prosecution; the tort of abuse of process is concerned with `the wrongful use of process after it has been issued,' while the tort of malicious prosecution is concerned with `the wrongfulissuance of process.'" Shoney's, Inc. v.Barnett, 773 So.2d 1015, 1024 (Ala.Civ.App. 1999). To establish the tort of abuse of process, a plaintiff must prove the existence of an ulterior purpose, the wrongful use of process, and malice. Barnett, 773 So.2d at 1024
(citing C.C. J., Inc. v. Hagood, 711 So.2d 947
(Ala. 1998)). The only action Mike Cook undertook was to make a police report. No process was issued and no legal proceedings were instituted as a result of the making of the police report. Thus, even viewing the facts in the light most favorable to the Hursts, as we must when reviewing a summary judgment,Nationwide Prop. Cos. Co., 792 So.2d at 372, the Hursts simply cannot establish the elements of either tort, and the summary judgment in the Cooks' favor on those counterclaims is therefore affirmed.
The trial court entered a summary judgment in favor of the Cooks on the Hursts' breach-of-contract counter-claim relating to the alleged breach of that portion of the written agreement pertaining to the real property. The fact that Carrie Cook was not a party to the written agreement formed the basis for the summary judgment in her favor; this undisputed fact precludes any breach-of-contract counterclaim against Carrie Cook.See generally Ligon Furniture Co. v. O.M. Hughes Ins.,Inc., 551 So.2d 283, 285 (Ala. 1989) (affirming a summary judgment on a breach-of-contract claim when the defendants were not parties to the contract). The basis of the trial court's summary judgment in Mike Cook's favor was that the written agreement violated the Statute of Frauds, codified at Ala. Code 1975, § 8-9-2, which requires that certain agreements be in writing to be enforceable.[3] *Page 1154 
However, the written agreement, although not in compliance with § 35-4-20, and therefore unable to convey any title to the property due to this deficiency, meets the requirements of the Statute of Frauds: it is an agreement regarding the intent to convey a life estate in real property that lists the consideration for the agreement and is signed by the party to be charged. The trial court's conclusion that the written agreement runs afoul of the Statute of Frauds appears to be based on the trial court's determination that the written agreement is unenforceable because it is merely an agreement to agree. See Muscle Shoals Aviation, Inc. v. Muscle ShoalsAirport Auth., 508 So.2d 225, 226 (Ala. 1987) (quotingClanton v. Bains Oil Co., 417 So.2d 149, 151 (Ala. 1982)) (stating the general rule that "`"agreements to later agree are not enforceable"'"). Although an agreement to agree is generally unenforceable, such an agreement is enforceable when it is "definite and certain in all of its terms and conditions so that the court can know what the parties agreed upon." Muscle Shoals Aviation, Inc., 508 So.2d at 228. The written agreement, which is set out earlier in this opinion, does have terms that are definite and certain and therefore appears to meet the requirements of the exception to the principle that agreements to agree are unenforceable.See Mobil Oil Corp. v. Schlumberger, 598 So.2d 1341,1345 (Ala. 1992).
However, in a case with marked similarity to this case, our supreme court determined that an action for breach of contract would not lie when only one of the parties holding a joint interest in land was a signatory to the contract. Obermarkv. Clark, 216 Ala. 564, 114 So. 135 (1927). InObermark F.L. Clark sought to purchase property owned jointly by A.F. Obermark and his sister, Sarah J. Gates. Obermark entered into a contract to sell the property to Clark based, in part, on Clark's assurance that he would secure a similar contract from Gates. Clark failed to secure from Gates a contract to sell her interest in the property. When the property was not conveyed to him, Clark sued Obermark. The supreme court explained why Obermark could not have breached the contract to sell the property.
"It is a well-settled principle of law that:
 "`Contracts must be interpreted in the light of the facts surrounding the parties when they were made. There cannot be a departure from the words of a written contract, they must have their full import and force; but to arrive at the true sense in which the parties employed them, courts of necessity consider the occasion which gave rise to the contract, the relation of the parties, and the object to be accomplished. Pollard v. Maddox, 28 Ala. 321
[(1856)]. As is said by Bishop: "The parties speak in their contract from the fountain of their mutual knowledge and if we would properly interpret their words, we must put ourselves exactly in their position, and know just what they mutually know, with neither addition nor abatement." Bishop on Contracts, § 370.' McGhee *Page 1155 et al. v. Alexander et al., 104 Ala. 116, 16 So. 148 [(1894)].
 "When the contract is considered in the light of the principle just stated, and the pleaded facts, it is clear that the plaintiff, Clark, did not contemplate nor intend to purchase merely the individual half interest of Obermark, but it was his purpose to purchase the entire title. It is equally as clear that Obermark, when he affixed his signature to the alleged contract, did not intend to acquire the interest of Mrs. Gates, but merely intended to sell his interest in the property and contemplated that Mrs. Gates would become a party to the agreement as to her interest. Under these circumstances it was impossible for Obermark to convey the entire title, and it would be unjust to hold him responsible for a failure to convey the entire title. The contract contemplated and intended to be made was a tripartite contract or agreement to sell, and it was as essential to the finality and completeness of assent that all the parties intended should be bound as it was that all of the terms should be definitely agreed upon. 6 R.C.L. pp. 616, 617, § 37, and authorities cited in note 110 Am. St. Rep. 747."
Obermark, 216 Ala. at 566, 114 So. at 136 (emphasis added). See also Jones v. McGivern, 274 Ala. 232, 234,147 So.2d 813, 814 (1962) (affirming a trial court's refusal to order specific performance of a husband's contract to sell property jointly owned by him and his wife when the wife never agreed to the sale because to require the husband to convey his interest "would be to require the husband to perform a contract he did not make").
The Hursts state in their affidavits that Mike Cook told them he would have Carrie Cook sign the written agreement, and it can be reasonably inferred that the Hursts knew that Carrie Cook would also be required to execute the deed to the life estate together with her husband. The Hursts never received a copy of the written agreement with Carrie Cook's signature on it. Nor did the Hursts ever receive a deed conveying a life estate in the property. The written agreement evidences an agreement between Mike Cook and the Hursts that Mike Cook would convey a life estate in the property; it does not indicate that Mike Cook was to convey only his interest in a life estate in the property. Mike Cook cannot convey a life estate in the property to the Hursts; he can convey only his interest in the jointly held property. Crommelin v. Fain,403 So.2d 177, 181 (Ala. 1981). Mike Cook contracted, however, to convey a life estate in the property in the future by executing a document to that effect, which, to be effective, also required the signature of his wife. Thus, based on Obermark andJones, to hold Mike Cook responsible for the breach of a contract to convey a life estate in the property would be unjust; the trial court's summary judgment regarding the Hursts' breach-of-contract counterclaim as to the real property is affirmed.[4]
The negligence, wantonness, and fraud counterclaims asserted by the Hursts are based in part on the failure of the Mike Cook to honor the written agreement to convey a life estate in the real property and in part on the failure of the Cooks to honor an oral agreement regarding a life estate in the real property made to the Hursts before the execution of the written *Page 1156 
agreement.[5] The trial court based its summary judgment on the tort counter-claims arising out of the written agreement in favor of Carrie Cook on the undisputed fact that she had not signed the agreement and therefore was under no duty to perform under the written agreement. Regarding the tort counterclaims against Mike Cook, the trial court concluded that, because the written agreement was unenforceable under the Statute of Frauds, the tort counterclaims were barred by the Statute of Frauds as well. See Holman v. Childersburg Bancorporation,Inc., 852 So.2d 691, 699-701 (Ala. 2002) (explaining that the plaintiff's tort claims, including those alleging negligence and fraud, were barred by the Statute of Frauds because to allow a plaintiff to recover in tort the benefit of the bargain he would have obtained had an oral promise running afoul of the Statute of Frauds been performed would render the statute meaningless). Because we have determined that the summary judgment on the breach-of-contract counterclaim relating to the real property should be affirmed, albeit for a slightly different reason than that relied on by the trial court, we affirm the trial court's judgment on the tort counterclaims arising from the breach of the written agreement to convey a life estate in the real property.
Insofar as the negligence, wantonness, and fraud counterclaims arose out of the oral agreement made by the Cooks, we agree with the trial court that the oral agreement to convey a life estate is unenforceable because it violates the Statute of Frauds and that any tort counterclaims based on the oral agreement must fail on that basis. Holman,852 So.2d at 699-701. Thus, we affirm the trial court's summary judgment on the tort counterclaims insofar as they are based on any oral agreement to convey a life estate made by the Cooks.
The Hursts' tort-of-outrage counterclaim is more difficult to analyze because it is not entirely clear upon which actions taken by the Cooks the counterclaim is premised. As noted above in the discussion about the other tort counterclaims arising out of the Hursts' allegations that the Cooks induced them to move into the Cooks' former house with an oral agreement that the Cooks would deed a life estate in the real property to the Hursts, any recovery by the Hursts in tort would be barred because the Cooks' oral agreement would run afoul of the Statute of Frauds. See Holman, 852 So.2d at 699. Insofar as the Hursts' tort-of-outrage counterclaim is based on Mike Cook's making a police report alleging that the Hursts had forged his name to the written agreement, the Hursts' tort-of-outrage counterclaim also fails.
A plaintiff seeking to establish the tort of outrage bears a heavy burden. "The tort of outrage was not developed to provide a person with a remedy for the trivial emotional distresses that are common to each person in his everyday life."U.S.A. Oil, Inc. v. Smith, 415 So.2d 1098, *Page 1157 
1101 (Ala.Civ.App. 1982). As our supreme court has explained:
 "This Court first recognized the tort of outrage, or intentional infliction of emotional distress, in American Road Service Co. v. Inmon, 394 So.2d 361 (Ala. 198[0]). In Inmon, the Court held that to present a jury question the plaintiff must present sufficient evidence that the defendant's conduct (1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it. The Court defined the second element of the tort of outrage as follows: `By extreme we refer to conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.' Inmon, 394 So.2d at 365 (quoting Restatement (Second) of Torts, § 46 cmt. d, at 72 (1948)).
 ". . . .
 "This court has consistently held that the tort of outrage is a very limited cause of that is available only in the most egregious circumstances. . . . In fact, in the 12 years since Inmon was decided, all cases in which this Court has found a jury question on an outrage claim have fallen within only three categories: 1) cases having to do with wrongful conduct in the context of family burials, see Whitt v. Hulsey, 519 So.2d 901 (Ala. 1987) (reckless desecration of family burial ground by adjacent landowner sufficient to present a jury question as to claim of outrage), Levite Undertakers Co. v. Griggs, 495 So.2d 63 (Ala. 1986) (defendant undertaker's wrongful retention of the remains of plaintiff's husband to force payment of funeral expenses sufficient to present a jury question as to claim of outrage), and Cates v. Taylor, 428 So.2d 637 (Ala. 1983) (defendant's withdrawal of permission to use a burial plot 30 minutes before the planned burial sufficient to present a jury question on claim of out-rage); 2) a case where insurance agents employed heavy-handed, barbaric means in attempting to coerce the insured into settling an insurance claim, National Security Fire Cos. Co. v. Bowen, 447 So.2d 133 (Ala. 1983); and 3) a case involving egregious sexual harassment, Busby v. Truswal Systems Corp., 551 So.2d 322
(Ala. 1989)."
Thomas v. BSE Indus. Contractors, Inc.,624 So.2d 1041, 1043-44 (Ala. 1993).
Even if Mike Cook's decision to make a police report was motivated by malice and his allegation of forgery was entirely false, such actions would not rise to the level of being a proper basis for the tort-of-outrage counterclaim. The circumstances surrounding the making of the police report and the subsequent investigation are far from the most egregious of circumstances, and it is impossible to conclude that Mike Cook's "`conduct [was] so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.'" Thomas,624 So.2d at 1043-44. In addition, the Hursts failed to present substantial evidence of any severe emotional distress they suffered as a result of Mike Cook's making of the police report.
The other actions by the Cooks that could form the basis of the Hursts' tort-of-outrage counterclaim are the Cooks' alleged harassment of the Hursts as they moved out of the house and the alleged burglary of the house by Carrie Cook or someone acting on her behalf. The Hursts' description of the harassment they suffered at the hands of the Cooks in their affidavits is generic and does not *Page 1158 
present substantial evidence creating a fact question regarding whether the conduct of the Cooks was "`so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.'" Thomas,624 So.2d at 1043-44. Even if we were to consider the allegation that Carrie Cook or a person acting on her behalf burglarized the house as being sufficient to reach the level of outrageousness necessary under Inmon and its progeny, the Hursts have still failed to present substantial evidence indicating that the Cooks' actions "caused emotional distress so severe that no reasonable person could be expected to endure it." Thomas, 624 So.2d at 1043. Thus, we affirm the summary judgment in favor of the Cooks on the Hursts' tort-of-outrage counterclaim.
In conclusion, we set aside the certification of the judgment as to the breach-of-contract counterclaims based on the breach of either the oral or written agreement to gift the personal property remaining in the house to the Hursts, the related tort counterclaims based on the breach of either the oral or written agreement to gift the personal property, and the determination that the Hursts are not entitled to punitive damages on that part of their defamation counterclaim based on allegedly libelous statements made by the Cooks. We affirm the judgment in favor of the Cooks on their claim seeking to quiet title to the property. We also affirm the judgment on the breach-of-contract counter-claim and related tort counterclaims relating to the oral and written agreements regarding the Cooks' promise to convey a life estate in the real property to the Hursts. Finally, we affirm the judgment on the malicious-prosecution, abuse-of-process, and tort-of-outrage counterclaims as well.
AFFIRMED IN PART; CERTIFICATION SET ASIDE IN PART; AND REMANDED.
THOMPSON, P.J., and PITTMAN and MOORE, JJ., concur.
BRYAN, J., concurs in the result, without writing.*
[1] The Hursts argue that the trial court did not actually enter a summary judgment on their breach-of-contract counterclaim because the trial court failed to list that counterclaim in the conclusion of the order as one of the claims it had adjudicated. The Cooks contend, however, that the substance of the summary-judgment order makes it clear that the trial court intended to adjudicate the breach-of-contract counterclaim by indicating that the counterclaim "must fail." Rule 58(b), Ala. R. Civ. P., states:
 "An order or a judgment need not be phrased in formal language nor bear particular words of adjudication. A written order or a judgment will be sufficient if it is signed or initialed by the judge . . . and indicates an intention to adjudicate, considering the whole record, and if it indicates the substance of the adjudication."
Thus, we agree with the Cooks that the breach-of-contract counterclaim was adjudicated by the trial court in their favor in the summary-judgment order.
[2] Section 35-4-20 reads in its entirety:
 "Conveyances for the alienation of lands must be written or printed, or partly written and partly printed, on parchment or paper, and must be signed at their foot by the contracting party or his agent having a written authority; or, if he is not able to sign his name, then his name must be written for him, with the words `his mark' written against the same, or over it; the execution of such conveyance must be attested by one witness or, where the party cannot write, by two witnesses who are able to write and who must write their names as witnesses; or, if he can write his name but does not do so and his name is written for him by another, then the execution must be attested by two witnesses who can and do write their names."
[3] The Statute of Frauds states, in pertinent part:
 "In the following cases, every agreement is void unless such agreement or some note or memorandum thereof expressing the consideration is in writing and subscribed by the party to be charged therewith or some other person by him thereunto lawfully authorized in writing:
 ". . . .
 "(5) Every contract for the sale of lands, tenements or hereditaments, or of any interest therein, except leases for a term not longer than one year, unless the purchase money, or a portion thereof is paid and the purchaser is put in possession of the land by the seller. . . ."
§ 8-9-2.
[4] The Cooks argue in their brief on appeal that the written agreement is unenforceable because of a failure of consideration. The written agreement itself, however, recites consideration for both the future conveyance and the written agreement.
[5] We note the inconsistencies in the arguments made by the Hursts regarding the tort counterclaims. On the one hand, the Hursts insist that their tort counterclaims are not based on any oral promises that run afoul of the Statute of Frauds, but, on the other hand, they argue that the injuries upon which they base those counterclaims do not stem solely from the execution of and breach of the written agreement but also flow from the Cooks' conduct and representations that induced the Hursts to abandon their other living arrangements and move into the Cooks' former house before the execution of the written agreement. We will therefore address the tort counter-claims insofar as they relate to both the alleged breach of the written agreement and the alleged breach of the oral promises made by the Cooks before the execution of the written agreement.
* Note from the reporter of decisions: When the opinion in this case was released on September 28, 2007, Judge Bryan was inadvertently shown as voting to concur. He actually concurred in the result.